UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COLD SPRING HARBOR LABORATORY,                  :

                 Plaintiff,               :

       - against -                             :

ROPES & GRAY LLP and                            :
MATTHEW P. VINCENT,

                      :

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CV-10 0661 (ADS)(AKT)


## DEFENDANT ROPES & GRAY LLP'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

PATTERSON BELKNAP WEBB & TYLER LLP
Philip R. Forlenza (prforlenza@pbwt.com)
Nicolas Commandeur (ncommandeur@pbwt.com)
Irena Royzman (iroyzman@pbwt.com)
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Ropes & Gray LLP*

# TABLE OF CONTENTS

Preliminary Statement................................................................................................1

Factual Background ...................................................................................................3

    Dr. Hannon's Alleged Invention and the Prosecution of Patents ............................3

    The PTO Rejected Hannon's Applications on Multiple Bases. ...............................5

    The PTO Has Consistently Interpreted the Fire Patent in  Rejecting the Hannon Applications and Applications of Other Scientists. ........................................................................7

    CSHL's Alleged Damages.........................................................................................9

    Allegations Regarding Mr. Vincent's Termination .................................................9

Argument .................................................................................................................10

I.  The Complaint Should Be Dismissed For Lack Of Venue And/Or Transferred To The District Of Massachusetts...........................................................................10

    A.  Venue Is Improper Under Section 1391(b)(1).................................................10

    B.  Venue Is Improper Under Section 1391(b)(2). ...............................................11

        1.  Venue Is Improper for CSHL's Claims Related to  Mr. Vincent's Alleged Malpractice.............................................................................................11

        2.  Venue Is Improper for CSHL's Supplemental Claims..............................13

II.  The Complaint Should Be Dismissed Pursuant To Rule 12(b)(6). .......................14

    A.  Standard and Choice of Law............................................................................14

    B.  The Complaint Fails to State a Claim for Legal Malpractice. ..........................15

    C.  The Breach of Fiduciary Duty Claim Is Duplicative of the Deficient Legal Malpractice Claim. ..................................................................................19

    D.  The Claim for Fraud and Fraudulent Concealment Should Be Dismissed as a Matter of Law..................................................................................................19

        1.  Alleged Failure to Disclose Copying ........................................................20

        2.  Allegations Regarding Invoices from Mr. Vincent's Company..................21

        Conclusion .................................................................................................23

**TABLE OF AUTHORITIES**

Page(s)

## CASES

Adamson v. Bachner,
No. 01-CV-10213 (JSM), 2002 U.S. Dist. LEXIS 21102
(S.D.N.Y. Oct. 31, 2002) ...........................................................20, 21

Amadasu v. Ngati,
No. 05-CV- 2585 (JFB), 2006 U.S. Dist. LEXIS 19654
(E.D.N.Y. March 27, 2006) .................................................................20

AmBase Corp. v. Davis Polk & Wardwell,
8 N.Y.3d 428, 434 (N.Y. 2007) ......................................................15, 18

Arnold v. KPMG, LLP,
553 F.Supp. 2d 230 (S.D.N.Y. 2008)..................................................19

Ashcroft v. Iqbal,
__ U.S. __, 129 S. Ct. 1937 (2009)...........................................15, 17, 21

Asher v. Shlimbaum,
45 A.D.3d 791 (N.Y. App. Div. 2007) ................................................17

Astor Holdings, Inc. v. Steefel, Levitt & Weiss, P.C.,
No. 03-CV-1242 (SAS), 2003 WL 21108316
(S.D.N.Y. May 14, 2003) ...............................................................12, 13

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007).............................................................................15

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002).................................................................3

Crigger v. Fahnestock and Co., Inc.,
443 F.3d 230 (2d Cir. 2006).................................................................20

Daniel v. Am. Bd. of Emergency Med.,
428 F.3d 408 (2d Cir. 2005)................................................10, 11, 12, 13

ECA v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009).................................................................20

Flutie Bros. LLC v. Hayes,
No. 04-CV-4187 (DAB), 2006 U.S. Dist. LEXIS 31379
(S.D.N.Y. May 18, 2006) .....................................................................16

Friedman v. Revenue Mgmt. of New York, Inc.,
    38 F.3d 668 (2d Cir. 1994)........................................................14

Gulf Ins. Co. v. Glasbrenner,
    417 F.3d 353 (2d Cir. 2005)..............................................10, 11, 12

Hanna v. Plumer,
    380 U.S. 460 (1965)...........................................................15

Henshell Corp. v. Childerston,
    No. 99-CV-2972, 1999 U.S. Dist. LEXIS 11388
    (E.D. Pa. July 28, 1999)......................................................13

Iannazzo v. Day, Pitney LLP,
    No. 04-CV-7413 (DC), 2007 U.S. Dist. LEXIS 50649
    (S.D.N.Y. July 10, 2007).....................................................19

Immunocept, LLC v. Fulbright & Jaworski, LLP,
    504 F.3d 1281 (Fed. Cir. 2007)................................................14

Johnson v. Nextel Commc'ns., Inc.,
    No. 09-CV-8473, 2009 U.S. Dist. LEXIS 35137
    (S.D.N.Y. Mar. 31 2009).....................................................18

Jordache Enter., Inc. v. Brobeck, Phleger & Harrison LLP,
    No. 92-CV-9002 (KMW) 1994 U.S. Dist. LEXIS 2551
    (S.D.N.Y. March 7, 1994)....................................................12

Kaempe v. Myers,
    367 F.3d 958 (D.C. Cir. 2004)..................................................3

LaBelle v. McGonagle,
    No. 07-12097-GAO, 2008 WL 3842998 (D. Mass. Aug. 15, 2008).............15, 16

Law Practice Mgmt. Consultants LLC v. M&A Counselors & Fiduciaries, LLC,
    599 F. Supp. 2d 355 (E.D.N.Y. 2009).......................................2, 18

Loeb v. Bank of Am.,
    254 F. Supp. 2d 581 (E.D. Pa. 2003)..........................................10

Mackley v. Sullivan & Liapakis, P.C.,
    No. 98-CV-4860 (SWK), 1999 U.S. Dist. LEXIS 6557, * 5
    (S.D.N.Y. May 5, 1999).......................................................21

Mecca v. Shang,
    685 N.Y.S.2d 458 (N.Y. App. Div. 1999) ...................................................19

Nazarro v. Balber,
    No. 05-CV-172, 2005 U.S. Dist.. LEXIS 20673
    (S.D.N.Y. Sept. 20, 2005) ...........................................................................18

Pisani v. Diener,
    No. 07-CV-5118 (JFB) (ARL), 2009 U.S. Dist. LEXIS 21352
    (E.D.N.Y Mar. 17, 2009) ..................................................................11, 12, 13

Rocanova v. Equitable Life Assurance Society,
    83 N.Y.2d 603 (N.Y. 1994) .........................................................................22

Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Roger, P.C.,
    927 F. Supp. 731 (S.D.N.Y. 1996) ........................................................11, 14

Seippel v. Jenkens & Gilchrist, P.C.,
    341 F. Supp. 2d 363 (S.D.N.Y. 2004)..........................................................19

Sentinel Prods. Corp. v. Platt,
    No. 98-CV-11143 (GAO), 2002 WL 1613713
    (D. Mass. July 22, 2002)...............................................................................15

Spencer Trask Software and Info. Servs. LLC v. RPost Int'l Ltd.,
    383 F.Supp. 2d 428 (S.D.N.Y. 2003)...........................................................22

Taylor v. American Chemistry Counsel,
    576 F.3d 16 (1st Cir. 2009)...........................................................................20

White of Lake George v. Bell,
    251 A.D.2d 777 (N.Y. App. Div. 1998) .......................................................21

White Plains Coat & Apron Co. Inc. v. Cintas Corp.,
    460 F.3d 281 (2d Cir. 2006)..........................................................................15

## STATUTES

28 U.S.C. § 1338............................................................................................14

28 U.S.C. § 1391(b)(1) .............................................................................10, 11

28 U.S.C. § 1391(b)(2) ...................................................................................11

Fed. R. Civ. P. 8..............................................................................................20

Fed. R. Civ. P. 9..............................................................................................20

Fed. R. Civ. P. 12(b)(3).......................................................................................1

Fed. R. Civ. P. 12(b)(6)............................................................................ 1, passim

Defendant Ropes & Gray LLP ("R&G") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint of Plaintiff Cold Spring Harbor Laboratory ("CSHL") pursuant to Fed. R. Civ. P. 12(b)(3) for improper venue and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

CSHL has sued R&G claiming that the firm and one of its former partners, Matthew Vincent, improperly described an alleged invention of CSHL scientists led by Dr. Gregory Hannon in certain patent applications (the "Hannon Applications"), and that the United States Patent and Trademark Office ("PTO") rejected the claims in those applications as a result. As discussed below, the Complaint has procedural and substantive flaws that require dismissal under Rule 12(b).

As a procedural matter, the Complaint should be dismissed for lack of venue. In cases claiming legal malpractice, venue lies where the defendant attorney committed the allegedly negligent acts. The relevant events giving rise to the allegations of Mr. Vincent's misconduct took place in Massachusetts, where Mr. Vincent resides and practiced law. Indeed, according to the Complaint, the *only* connection between the facts of this case and this District is that the plaintiff, CSHL, is located here. As a matter of law, that connection alone is insufficient to establish venue in this District and the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(3).

As a substantive matter, the Complaint should be dismissed as it fails to state a cause of action upon which relief may be granted. The core premise of CSHL's legal malpractice claim is not only speculative and implausible on its face, it is also flatly contradicted by the indisputable documentary record.

CSHL contends that, unbeknownst to Dr. Hannon and CSHL, Mr. Vincent used text copied from the patent application of another scientist, Dr. Andrew Fire (the "Fire Application"), to describe Dr. Hannon's alleged invention. CSHL further alleges that this copying led the PTO to conclude that Dr. Hannon's alleged invention was indistinguishable from Dr. Fire's, and therefore unsuitable for patent protection.

Although the science underlying Dr. Hannon's alleged invention may be complicated, the fundamental flaws in CSHL's malpractice claim are simple and apparent. Whereas the Complaint focuses exclusively on the PTO's reliance upon Fire, the decisions rejecting the various Hannon Applications – the same rejections that CSHL cites in its Complaint – rejected the proposed claims not only based on Fire, but also on the separate and independent grounds that Dr. Hannon's alleged invention was not patentable in view of earlier disclosures by other researchers in addition to Dr. Fire. The Complaint fails even to mention the PTO's reliance upon the disclosures of these other scientists, much less to suggest that anything Mr. Vincent did led the PTO to conclude that their disclosures provided independent bases for rejecting the claims sought in the Hannon Applications. This failure alone means that CSHL cannot meet the causation elements of its malpractice claim.

Even with respect to the PTO's reliance upon the Fire patent in denying the Hannon Applications, which is the focus of the Complaint, CSHL's malpractice claim requires the finder of fact to determine (1) that the PTO misunderstood what Fire discloses; and (2) that Mr. Vincent's conduct is what caused that supposed misunderstanding. Such a "considerable and purely speculative leap" is incompatible with a claim for legal malpractice, which requires "but-for" causation. Law Practice Mgmt. Consultants LLC v. M&A Counselors & Fiduciaries, LLC, 599 F. Supp. 2d 355, 359 (E.D.N.Y. 2009) (Spatt, J.). Indeed, the PTO's understanding of

Fire cannot have been caused by Mr. Vincent's actions because the PTO has applied the same understanding of Fire in rejecting patent applications by other scientists who were represented by different counsel.

CSHL's remaining claims also should be dismissed. The breach of fiduciary duty claim merely restates the same insufficient allegations as the legal malpractice cause of action. The claim for fraud fares no better. As a matter of law, CSHL cannot assert a claim for fraud simply by arguing that Mr. Vincent concealed his alleged malpractice. And CSHL's claim for fraudulent concealment relating to Mr. Vincent's billing for services performed by his privately owned firm is also without merit. CSHL has not adequately alleged that it suffered damage as a result of the alleged conduct – a necessary predicate to any fraud claim.

## FACTUAL BACKGROUND

The facts below derive from the Complaint, documents referenced in the Complaint, and matters of public record of which this Court may take judicial notice (including certain decisions of the PTO). See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (holding that it is proper to consider documents incorporated into the complaint by reference, or documents "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (quotation omitted); Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004) ("The documents recorded by the PTO were not attached to Kaempe's complaint. However, the cited documents are public records subject to judicial notice on a motion to dismiss.").

### Dr. Hannon's Alleged Invention and the Prosecution of Patents

CSHL sought to obtain patent protection for Dr. Hannon's work in the field of RNA interference ("RNAi"). (Compl. ¶ 7.) In general terms, RNAi refers to the cellular process by which double stranded RNA ("dsRNA") are used to regulate when genes are turned "off" and

"on" in the cell. (Compl. ¶ 7.) The process is of interest to researchers working to suppress the expression of certain undesirable target genes, such as those associated with cancer. (Compl. ¶ 7.) The study of RNAi is a crowded field in which many prominent scientists are working and making various advances. For example, Dr. Andrew Fire – the scientist whose patent served as one of the bases for the denial of the Hannon Applications – received the 2006 Nobel Prize in Medicine for his discoveries in the field of RNAi. See

http://med.stanford.edu/featured_topics/nobel/fire/.

According to the Complaint, Dr. Hannon's alleged invention that was the subject of the Hannon Applications consisted of turning off target genes (via RNAi) in mammalian cells through the use of so-called "short hairpin" RNAs ("shRNAs"). (Compl. ¶ 7.) Mr. Vincent and R&G served as outside patent counsel in the prosecution of the Hannon Applications. (Compl. ¶¶ 22, 23.) At all relevant times, Mr. Vincent worked out of R&G's Boston office; he was a resident of Massachusetts and was until July 2009 a member of the Massachusetts Bar. (Compl. ¶¶ 3, 4.)

As set forth in the Complaint, the prosecution of the patent applications relating to Dr. Hannon's alleged invention has been a long and complicated process, with much back-and-forth between Mr. Vincent and representatives of CSHL, on the one hand, and the PTO, on the other. Dr. Hannon "regularly communicated" with Mr. Vincent regarding the applications (Compl. ¶ 31) and he reviewed each of the patent applications before it was filed. Indeed, Dr. Hannon (along with his four co-inventors) signed declarations under oath that were submitted to the PTO confirming that each application accurately disclosed the work for which they were seeking patent protection. (Declaration of Philip R. Forlenza ("Forlenza Decl."), Exhs. A-E.)

The crux of CSHL's malpractice claim is its allegation that Mr. Vincent improperly described Dr. Hannon's work in the early patent applications by copying text from the Fire Application and then subsequently relied upon that allegedly improper description. (Compl. ¶ 27.)  Significantly, CSHL does not contend that there is anything inherently wrong with copying text into a patent application.  To the contrary, such copying is accepted practice. See DAVID PRESSMAN, PATENT IT YOURSELF 181 (13th ed. 2008) (sold in the PTO's store and relied on by many practitioners) ("If you see any prior-art patent whose specification contains words, descriptions, and/or drawing figures that you can use in your application, *feel free to plagiarize!*  Patents are not covered by copyright and it's considered perfectly legal and ethical to make use of them.") (emphasis added).

Rather, CSHL's claim is that by copying text from the Fire Application, Mr. Vincent "*implied* that Dr. Hannon's short hairpin RNA technology was either something that Dr. Fire invented or was suggested by the Fire Application." (Compl. ¶ 10) (emphasis added). CSHL asserts that this "unfairly prejudiced [the Hannon Applications] by the *erroneous perception* that the technology invented by Dr. Hannon is not sufficiently unique from what the Fire application describes…" (Compl. ¶ 12) (emphasis added).  Tellingly, CSHL never alleges how Mr. Vincent should have otherwise described the alleged invention, besides repeating the vague mantra that he should have used "original text accurately describing [Dr. Hannon's work]." (Compl. ¶ 30.)

**The PTO Rejected Hannon's Applications on Multiple Bases.**

Although the PTO initially allowed one of the Hannon Applications, the PTO later withdrew the allowance "due to a mistake by the [PTO]" and rejected the claims.  (Compl. ¶¶ 38-39; '557 application, 9/06/2006 Office Action at p. 2 (Forlenza Decl. Exh. F)).  The PTO provided several bases for its rejection.  In addition to the Fire reference that is the sole focus of

5

CSHL's Complaint, the PTO determined that a published patent application to Dr. Yin-Xiang Li, et al., was an anticipatory reference (i.e., that it disclosed all of the subject matter in Dr. Hannon's sought-after claims) and that a patent issued to Dr. Michael Graham, et al., rendered Dr. Hannon's claims obvious. See id. at pp. 8-12; '557 application, 9/04/07 Final Office Action at pp. 6-7, 13-15 (Forlenza Decl. Exh. H); '557 application, 9/16/08 Final Office Action at pp. 7-8, 14-16 (Forlenza Decl. Exh. G).  For example, with respect to Dr. Li, the PTO noted in rejecting the Hannon Application:

> Li et al disclose a method for attenuating the expression of a target gene in a cell comprising introducing into the cell a double stranded RNA in an amount sufficient to attenuate expression of the target gene... The cell can be a **mammalian cell** including a human cell. ... The double stranded RNA can be formed from one strand to take the form of a self-complementary **hairpin-type molecule ... at least 25 (which includes 25) bases in length** [i.e., a **short hairpin**].

'557 application, 9/16/08 Final Office Action at pp. 7-8 (Forlenza Decl. Exh. G) (emphasis added); see also '557 application, 9/04/07 Final Office Action at p. 6 (Forlenza Decl. Exh. H); '557 application, 9/06/2006 Office Action at p. 8 (Forlenza Decl. Exh. F).

The PTO repeatedly found that the disclosures of *each* of these three teams of scientists (Fire et al., Li et al., and Graham et al.) separately and independently pre-dated Dr. Hannon's supposed invention – i.e., the expression of short hairpin, double-stranded RNAs in mammalian cells to effect RNAi – and rendered it unpatentable.  CSHL does not suggest in its Complaint that Mr. Vincent's alleged malpractice did anything to contribute to the PTO's determination that the disclosures of these other scientists besides Dr. Fire precluded the claims in the Hannon Applications.

Subsequent rejections by the PTO of the Hannon Applications – rejections of separate applications and/or of distinct claims (including those asserted in attempts to overcome

prior rejections) – have similarly been based upon multiple examples of preclusive disclosures

by other scientists. For example, the most recent rejections by the PTO of two of the Hannon

Applications rely on another independent ground for rejecting the patent claims sought by

CSHL. The PTO determined that the published patent application of Dr. Ronald Kreutzer, et al.,

disclosed or made obvious all of the claims sought by CSHL, and rejected CSHL's claims for

that reason. See '086 application, 8/26/09 Office Action at pp. 8-11 (Forlenza Decl. Exh. I);

'676 application, 1/27/10 Final Office Action at pp. 11-13 (Forlenza Decl. Exh. J). The PTO

noted:

> Kreutzer et al. disclose a method of attenuating expression of a
> target gene in **mammalian** cells using a ***shRNA [short hairpin***
> ***RNA]*** comprising 10-1000 nucleotide base pairs which
> encompasses the claimed shRNA and preferably teach the shRNA
> have 15-49 pairs.

'086 application, 8/26/09 Office Action at p. 9 (Forlenza Decl. Exh. I) (emphasis added). Again,

the Complaint contains no mention of the Kreutzer reference, much less an allegation that Mr.

Vincent's conduct somehow led the PTO to determine that it precluded the claims in the Hannon

Applications.

**The PTO Has Consistently Interpreted the Fire Patent in**
**Rejecting the Hannon Applications and Applications of Other Scientists.**

In addition, the Complaint does not provide a factual basis for CSHL's

speculation that the PTO's interpretation of Fire was caused by Mr. Vincent's actions. Indeed,

the PTO has consistently interpreted the disclosures in the Fire patent in the same fashion when

rejecting both (i) the Hannon Applications; and (ii) applications by other scientists who were not

represented by Mr. Vincent or by R&G and whose applications did not copy text from Fire.

First, the PTO has repeatedly emphasized that Fire pre-dates Dr. Hannon's work

and disclosed the invention for which CSHL seeks patent protection. The PTO rejected the

argument made by CSHL in prosecuting the patent applications – reiterated by CSHL in its

Complaint (Compl. ¶¶ 20, 32, 44) – that Dr. Fire only disclosed *long* double stranded RNA

molecules, not the *short* hairpins that are allegedly the focus of Dr. Hannon's work.  Instead, the

examiner stated:

> Fire et al. explicitly discloses methods of attenuating expression of
> a target gene in cells wherein the cells are *mammalian* cells,
> discloses a dsRNA wherein the dsRNA can be formed by a self-
> complementary single stranded RNA *i.e. a hairpin RNA*, discloses
> each strand of the hairpin RNA can be at least 25 nucleotides in
> length *i.e. a short hairpin RNA* ....

'086 application, 8/26/09 Office Action at pp. 15-16 (Forlenza Decl. Exh. I) (emphasis added);

see also '557 application, 9/04/07 Final Office Action at pp. 3-5 (Forlenza Decl. Exh. H); '557

application, 9/16/08 Final Office Action at pp. 5-6 (Forlenza Decl. Exh. G).

      Second, the PTO has interpreted Dr. Fire's disclosure in the same way in rejecting

patent applications filed by other influential scientists in the field of RNAi, including those of

Dr. Graham and of Dr. David Engelke (of the University of Michigan) and their respective co-

inventors.  See '724 application, 9/2/09 Office Action at pp. 4-5 (Forlenza Decl. Exh. K); '247

application, 11/26/08 Final Office Action at pp. 22-23, 27-28 (Forlenza Decl. Exh. L).  The PTO

rejected the applications by these other scientists as unpatentable in view of Fire notwithstanding

the fact that they were drafted and prosecuted by attorneys other than Mr. Vincent and did not

copy substantial text from Fire.  (Id.)

      For example, in rejecting the patent claims of Dr. Engelke's team, the PTO

interpreted Fire just as it did in rejecting the Hannon Applications:

> Fire et al. teach methods of RNA interference in cells by
> administering compositions comprising double stranded RNAs.
> These dsRNAs are complementary to a target gene and ... are
> taught as formed from *a single self complementary strand [i.e., a*
> *hairpin]*.  Fire et al. teach ... that the dsRNA can be *25 base pairs*
> *in length [i.e., a short hairpin]*.  Fire et al. teach ... that the

> dsRNA of their invention can be made in cells, including
> ***mammalian*** and human cells...

'724 application, 9/2/09 Office Action at pp. 4-5 (Forlenza Decl. Exh. K) (emphasis added).

## CSHL's Alleged Damages

CSHL's claimed damages with respect to the legal malpractice claim are vague and bereft of factual support. CSHL claims it has lost tens of millions of dollars in hypothetical licensing fees (Compl. ¶ 60) and complains of a "potential" – but not actual – loss of priority for Dr. Hannon's alleged inventions. (Id. ¶ 33) Notably, the Complaint does not allege that anything Mr. Vincent did or did not do will preclude CSHL from obtaining a patent on the Hannon Applications. Indeed, CSHL continues to prosecute these same Hannon Applications through successor counsel at Wilmer Cutler Pickering Hale and Dorr, LLP. (Compl. ¶ 59.)

## Allegations Regarding Mr. Vincent's Termination

In April 2009, Mr. Vincent was terminated from R&G, and in July 2009, he resigned from the Massachusetts Bar as a result of conduct relating to billing clients for patent-database-search services by a company that he owned (the IP Resource Company). (Compl. ¶¶ 61, 63.) CSHL's allegations on this point are lifted from an affidavit that Mr. Vincent filed in connection with a State of Massachusetts disciplinary proceeding. (Compl. ¶ 63.) The Complaint alleges that Mr. Vincent "never maintained or did not retain" the billing records for the invoices submitted by IP Resource Company. (Compl. ¶ 63.) These invoices were submitted to R&G for payment and then billed to the appropriate client for the services. (Id.) The Complaint also confirms that R&G was not aware that Mr. Vincent was the owner and operator of the IP Resource Company. (Compl. ¶ 63.) CSHL asserts that it paid approximately $10,000 to R&G for work allegedly performed by the IP Resource Company. (Compl. ¶ 64.)

9

Significantly, CSHL fails to allege how it has been damaged by payment of these invoices. In particular, it does not – and cannot – allege that the amounts paid have not been reimbursed. The Court can, and should, infer from the lack of such allegations that CSHL has already been repaid for the expenditures.

## ARGUMENT

## I.   THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF VENUE AND/OR TRANSFERRED TO THE DISTRICT OF MASSACHUSETTS.

The Complaint asserts in conclusory terms that venue is proper pursuant to either 28 U.S.C. § 1391(b)(1) or (b)(2). (Compl. ¶ 6.) Because Mr. Vincent does not reside in this State, and because the relevant events underlying the causes of action took place outside the District, venue is improper under either provision.

### A.   Venue Is Improper Under Section 1391(b)(1).

Venue under Section 1391(b)(1) is only available in "a judicial district where any defendant resides, if all defendants reside in the same State." Here, it is clear from the face of the complaint that Mr. Vincent resides in Massachusetts, not New York. (Compl. ¶ 3.) Thus, venue under Section 1391(b)(1) is inappropriate in this District. See Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 356 (2d Cir. 2005) (concluding that § 1391(b)(1) does not apply where defendants reside in different states); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 431 (2d Cir. 2005) (same); Loeb v. Bank of Am., 254 F. Supp. 2d 581, 586 (E.D.Pa. 2003) ("[U]nder 1391(a)(1), venue in the Eastern District of Pennsylvania would be inappropriate because all of the defendants do not reside here.") (citing the diversity venue language counterpart to venue in § 1391(a)(1), whose language is identical to that of § 1391(b)(1)).

### B.      Venue Is Improper Under Section 1391(b)(2).

Equally unavailing is CSHL's contention that venue is proper pursuant to Section

1391(b)(2), (Compl. ¶ 6), which provides, in relevant part, that venue is appropriate in "a judicial

district in which a substantial part of the events or omissions giving rise to the claim occurred."

28 U.S.C. § 1391(b)(2).  The Second Circuit has held that courts must "take seriously the

adjective 'substantial,'" and "construe the venue statute strictly."  Gulf Ins., 417 F.3d at 357.  In

analyzing venue under this section, the Second Circuit demands a two-part inquiry: "First, a

court should identify the nature of the claims and the acts or omissions that the plaintiff alleges

give rise to those claims.  Second, the court should determine whether a substantial part of those

acts or omissions occurred in the district where suit was filed, that is, whether significant events

or omissions material to those claims have occurred in the district in question."  Daniel, 428 F.3d

at 432 (quotations and alterations omitted).  Applying this standard, venue is inappropriate here.

### 1.      Venue Is Improper for CSHL's Claims Related to
####         Mr. Vincent's Alleged Malpractice.

In legal malpractice cases, the relevant acts and omissions for venue purposes are

the defendant lawyer's actions, which necessarily occurred in the district in which the attorney

was practicing.  See Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Roger, P.C., 927

F. Supp. 731, 736 (S.D.N.Y. 1996) ("Any extortion, malpractice, misrepresentation,

fraud/conspiracy, unethical conduct, or breach of fiduciary duty which defendants may have

committed against plaintiffs would have been committed in Pennsylvania or Delaware, where

defendants reside and where they prepared for and litigated the Underlying Action, and venue

would be appropriate in a district in one of those states pursuant to 28 U.S.C. § 1391(a)(1) or

(2).") (citing language identical to that of § 1391(b)(1) and (b)(2) from the diversity venue

subsection of §1391(a)(1) and (a)(2)); Pisani v. Diener, No. 07-CV-5118(JFB)(ARL), 2009 U.S.

Dist. LEXIS 21352 (E.D.N.Y. March 17, 2009) (concluding that venue in the Eastern District of

New York was improper over, among others, malpractice and fraud claims where defendant

attorneys lived and practiced law in Florida); Astor Holdings, Inc. v. Steefel, Levitt & Weiss,

P.C., No. 03-CV-1242 (SAS), 2003 WL 21108316 (S.D.N.Y. May 14 2003) (concluding that

venue in the Southern District of New York was improper over a malpractice claim where

defendant attorney lived and practiced law in California); Jordache Enter., Inc. v. Brobeck,

Phleger & Harrison LLP, 92-CV-9002 (KMW), 1994 U.S. Dist. LEXIS 2551 (S.D.N.Y. March

7, 1994) (concluding that venue in the Southern District of New York was improper over

malpractice and breach of contract claims where attorneys practiced law in California).

 According to the Complaint, Mr. Vincent resides and worked at all relevant times

in Massachusetts, and was admitted to the Massachusetts Bar while he provided services to

CSHL. The Complaint does not mention a single act by Mr. Vincent or R&G that occurred in

the Eastern District of New York. Indeed, the only event mentioned in the Complaint that took

place even in the *State* of New York was a meeting between CSHL and R&G in April 2008.

CSHL does not allege that this meeting somehow contributed to Mr. Vincent's alleged

malpractice – indeed, the purpose of the meeting apparently was for CSHL to raise with Mr.

Vincent its concerns about the copying. In any event, this meeting in *Manhattan* (Compl. ¶ 58)

is insufficient to establish proper venue in the *Eastern District of New York.* See Gulf Ins., 417

F.3d at 357-58 (remanding where complaint did not specify which district in New York events

took place).

 Nor does the fact that CSHL is located in the District establish venue here. Courts

routinely reject efforts by plaintiffs located in the district to bring legal malpractice claims

against out-of-district lawyers. For example, in Jordache, the plaintiff's principal place of

business was in New York and the defendant attorneys had made twenty-five trips to New York in connection with their representation of the plaintiffs, at least some of which were to discuss the state court actions that plaintiffs alleged defendants handled negligently.  1994 U.S. Dist. LEXIS 2551 at * 2, 12.  Despite these contacts, the court concluded that venue in the Southern District of New York was inappropriate because these contacts did "not represent a significant portion of the events giving rise to plaintiffs' malpractice claim."  Id. at *13.  In another case in the Southern District of New York, the court concluded that venue was improper over a malpractice action under Section 1391(a)(2) where the attorney lived and practiced law in California.  See Astor Holdings, 2003 WL 1108316, * 7.  The court reached this conclusion notwithstanding the attorney's participation in several conference calls with plaintiffs in New York, and his participation in a meeting in New York that related to the action that plaintiff alleged was handled negligently.  Id. at 7.  See also Daniel, 428 F.3d at 434 (concluding that communications made through letters sent to plaintiffs' homes in Western District of New York was insufficient to establish venue in that district); Henshell Corp. v. Childerston, No. 99-CV-2972, 1999 U.S. Dist. LEXIS 11388 (E.D. Pa. July 28, 1999) (concluding that venue over malpractice action was improper despite numerous calls and mailings to plaintiffs in district).

### 2.    Venue Is Improper for CSHL's Supplemental Claims.

CSHL's claims for breach of fiduciary duty (the Second Claim) and fraud (the Third Claim) relating to Mr. Vincent's allegedly negligent patent prosecution are based upon the same facts as CSHL's legal malpractice claim.  Not only does this make them deficient as a matter of law, see infra at 19-22, but it also means that they cannot provide an independent basis for venue.  See Pisani, 2009 U.S. Dist. LEXIS 21352, * 26 (transferring action based on improper venue for malpractice, fraud, and other claims where "all of the alleged actions that are the basis" for the claims took place in another district); Saferstein, 927 F.Supp. 731 (S.D.N.Y.

13

1996) (determining that venue was improper over claims of fraud, breach of fiduciary, and legal

malpractice claims where "the factual basis supporting these claims occurred outside" of New

York).  Similarly, CSHL's fraud claim relating to Mr. Vincent's billing for services of his IP

Resource Company does not make venue proper in this District because the complained-of acts

occurred in Massachusetts, not New York.  See Friedman v. Revenue Mgmt. of New York, Inc.,

38 F.3d 668 (2d Cir. 1994) (dismissing, among others, fraud claims where actions relevant to

fraud occurred in Illinois).  And even if venue were proper over this claim, the Court should still

dismiss it, given that the Court lacks independent subject matter jurisdiction over this pendant

claim (because it does not implicate the substantive questions of federal patent law that confer

jurisdiction over the legal malpractice claim).  See Saferstein, 927 F. Supp. 731, 737 (S.D.N.Y.

1996) (transferring a claim over which venue was proper where venue was improper as to the

remaining claims, including malpractice, fraud, and breach of fiduciary duty).

## II.     THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6).

Even if venue were proper in this Court, the action should be dismissed under

Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### A.     Standard and Choice of Law

The Complaint does not specify the applicable law that controls CSHL's claims.

CSHL contends that the Court has federal question subject matter jurisdiction (Compl. ¶ 5),

presumably because the malpractice claims depend on the resolution of a substantial question of

federal patent law.  See Immunocept, LLC v. Fulbright & Jaworski, LLP, 504 F.3d 1281, 1283

(Fed. Cir. 2007) (concluding that jurisdiction under 28 U.S.C. § 1338 was appropriate where "the

malpractice claim presents a substantial question of patent law . . .").  Nevertheless, the

substantive elements of each cause of action are governed by state law.  See id. at 1286-1289

(applying substantive Texas law to legal malpractice claim); Sentinel Prods. Corp. v. Platt, No. 98-CV-11143 (GAO), 2002 WL 1613713 (D. Mass. July 22, 2002) (applying substantive Massachusetts law to legal malpractice claims related to patent prosecution).  In this case, there is no need for the Court to choose between the law of New York (where CSHL is based) and Massachusetts (where Vincent worked) because there is no material difference between the two with respect to the elements of each of CSHL's claims.  See White Plains Coat & Apron Co. Inc. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006).

Although state law governs CSHL's claims, the applicable pleading standards come from the Federal Rules of Civil Procedure.  See, e.g., Hanna v. Plumer, 380 U.S. 460, 465 (1965).  For a complaint to survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

**B.    The Complaint Fails to State a Claim for Legal Malpractice.**

A plaintiff seeking to prove legal malpractice must demonstrate three elements: (1) that the attorney was negligent in the representation; (2) that the client-plaintiff suffered actual damages; and (3) that the attorney's negligence was the "but-for" cause of those damages. See AmBase Corp. v. Davis Polk & Wardwell, 8 N.Y.3d 428, 434 (N.Y. 2007); LaBelle v. McGonagle, No. 07-CV-12097 (GAO), 2008 WL 3842998 at *2 (D. Mass. Aug. 15, 2008).  To prevail on a claim of legal malpractice in connection with patent prosecution:

> the plaintiffs must demonstrate that but for [the attorney's] negligence
> they would have received a valid patent with consequent economic

> benefit.  To do so, the plaintiffs would need to establish the patentability
> of their claimed invention ....

LaBelle, 2008 WL 3842998 at *2.  The allegations in CSHL's Complaint fail to satisfy these elements.

As an initial matter, CSHL cannot overcome the fact that the PTO rejected Dr. Hannon's claims not only based on the Fire patent but also on separate and independent grounds having nothing to do with Fire or the alleged malpractice.  Although the Complaint focuses exclusively on the PTO's reliance upon Fire in rejecting the Hannon Applications, the examiners made clear that the Hannon Applications *would have been rejected in any event*.  In particular, the examiners' rejections of the Hannon Applications were based on prior art references separate and apart from Fire.  For example, the PTO explained that both the Graham patent and the Li application preempted the invention that CSHL now claims in the Complaint.  In other rejections, the PTO has also determined that Dr. Kreutzer's disclosures serve as an independent basis for rejecting the Hannon Applications.  The Complaint contains no allegation suggesting that Mr. Vincent's conduct did anything to contribute to the examiner's determination with respect to these other references.  Indeed, the Complaint does not even mention these other grounds of rejection.

In similar situations where an adverse decision in an underlying proceeding sets forth bases for the ruling that have nothing to do with the attorney's alleged negligence, courts have refused to allow malpractice claims to proceed.  For example, in Flutie Bros. LLC v. Hayes, No. 04 Civ 4187 (DAB), 2006 U.S. Dist. LEXIS 31379 (S.D.N.Y. May 18 2006), the court dismissed on a Rule 12(b)(6) motion the legal malpractice claim stemming from an adverse decision in a lawsuit, because the trial court in the lawsuit did not rely upon the attorney's alleged errors in reaching the decision.  The court explained: "Plaintiff's hodgepodge of

arguments of things it alleges [the defendant lawyer] should have done, do not in any way demonstrate that these failures would have changed the Bankruptcy Judge's determinations." Id. at *20.  In another case, an appellate court in New York affirmed the dismissal of a malpractice claim, concluding that such a malpractice claim could not be established where the decision in the underlying action provided a reason unrelated to the alleged negligence for the dismissal of that action.  See Asher v. Shlimbaum, 45 A.D.3d 791 (2d Dep't 2007).  Because the indisputable documentary evidence (i.e., the PTO decisions) confirms that Mr. Vincent's alleged malpractice was not the but-for cause of CSHL's failure to obtain a patent on Dr. Hannon's alleged invention, the malpractice claim fails as a matter of law.

Moreover, even with respect to the PTO's rejections based on Fire (the only basis for the PTO's rejections referenced in the Complaint), CSHL cannot establish that "but for" Mr. Vincent's conduct, the PTO would have allowed Dr. Hannon's patent claims to issue.  The PTO has repeatedly concluded that Fire discloses the use of short-hairpin RNA to effect RNA interference in mammalian cells (see supra pp. 7-9) – i.e., Dr. Hannon's alleged invention. CSHL's claim thus depends upon the finder of fact determining: (1) that *each* of the several patent examiners at the PTO who reached the same conclusion regarding the import of Fire got it wrong; and (2) that the PTO *only* made this mistake because Mr. Vincent copied text from the Fire Application into the Hannon Applications.  This is implausible speculation.  Indeed, it would require the fact finder to disregard the fact that the PTO has made the same supposedly mistaken interpretation of Fire's disclosures across several *different* patent applications from *different* inventors who were not represented by Mr. Vincent or R&G and did not copy text from Fire.  Such an untenable claim should be dismissed.  See Iqbal, 129 S.Ct. at 1951 ("Taken as true, these allegations are consistent with [plaintiffs' theory of the case].  But given more likely

explanations, they do not plausibly establish this [theory]."); Twombly, 550 U.S. at 570

("[Where plaintiffs] have not nudged their claims across the line from conceivable to plausible,

their complaint must be dismissed.")

   Courts routinely dismiss such speculative legal malpractice claims.  For example,

this Court recently dismissed a legal malpractice claim on a Rule 12(b)(6) motion where the

plaintiff claimed that it was unsuccessful in the underlying litigation because of counsel's failure

to timely file papers in opposition to a motion for summary judgment.  See Law Practice Mgmt.

Consultants, 599 F. Supp. 2d at 359 (Spatt, J.).  Notwithstanding the attorney's apparent

negligence, this Court found that causation was too attenuated: "The Court is unwilling to take

the considerable and purely speculative leap that the Plaintiffs would have prevailed in the BVI

Litigation before Boston Life went into liquidation if only [the defendant attorney] had timely

filed papers in opposition to [the] motion for summary judgment." Id. See also Johnson v.

Nextel Commc'ns., Inc., No. 09-CV-8473, 2009 U.S. Dist. LEXIS 35137 * 23 (S.D.N.Y. Mar.

31 2009) ("[Plaintiffs] purely speculate that had defendants not agreed on attorney's fees,

plaintiffs might have received more. ... Such a speculative argument cannot be the basis of a

valid claim."); Nazarro v. Balber, No. 05-CV-2172, 2005 U.S. Dist. LEXIS 20673 (S.D.N.Y.

Sept. 20, 2005) (granting motion to dismiss legal malpractice claim where plaintiff did not allege

how defendant attorney's selection of an improper venue damaged plaintiffs); AmBase, 8

N.Y.3d at 436 ("In this matter, there is no way to know whether the advice not given ... would

have altered the [duration] of the [underlying] action. ... Therefore, any effect of such lack of

advice is purely speculative and cannot support a legal malpractice claim.").  CSHL's legal

malpractice claim should be similarly dismissed.

**C.    The Breach of Fiduciary Duty Claim Is Duplicative of the Deficient Legal Malpractice Claim.**

Based on the same conduct that CSHL alleges gives rise to a claim for malpractice, CSHL attempts to state a claim for breach of fiduciary duty (in the Second Claim in the Complaint).  CSHL's Second Claim "repeats and realleges the allegations" that support its malpractice cause of action, (Compl. ¶ 73), but makes no further factual allegations whatsoever. (Compl. ¶¶ 74-76).  Likewise, CSHL's claim for damages for the alleged breach of fiduciary duty are duplicative of the damages claimed for the alleged malpractice:  attorneys fees and lost licensing fees.  (Compare Compl. ¶¶ 70-72 with Compl. ¶ 77.)  Where, as here, a breach of fiduciary duty claim is based on the same allegations as a cause of action for legal malpractice, courts dismiss the fiduciary duty claim.  See, e.g., Arnold v. KPMG, LLP, 553 F.Supp. 2d 230, 232 (S.D.N.Y. 2008), aff'd by 334 Fed. App'x 349, 351 (2d Cir. 2009) (unpublished), Iannazzo v. Day, Pitney LLP, No. 04-CV-7413 (DC), 2007 U.S. Dist. LEXIS 50649, *29 (S.D.N.Y. July 10, 2007); Seippel v. Jenkens & Gilchrist, P.C., 341 F. Supp. 2d 363, 376 (S.D.N.Y. 2004); Mecca v. Shang, 685 N.Y.S.2d 458, 459-60 (N.Y. App. Div. 1999).  The same result is appropriate here.

**D.    The Claim for Fraud and Fraudulent Concealment Should Be Dismissed as a Matter of Law.**

CSHL's Third Claim for relief describes two "separate" supposed frauds. (Compl. ¶ 85.)  The first stems from the same conduct that CSHL alleges gives rise to its malpractice claim; namely, Mr. Vincent's purported failure to disclose that some of the information in the Hannon Applications was copied from the Fire Application.  The second stems from a claim totally unrelated to the underlying patent applications, concerning CSHL paying bills for the services of Mr. Vincent's private company.  Because CSHL's allegations do

not state fraud or fraudulent concealment claims under either set of facts, the Third Claim in the Complaint should be dismissed.

To set forth a claim for fraud, a plaintiff must establish all of the following elements: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; and (4) reasonable reliance on the part of the plaintiff (5) resulting in damage to the plaintiff. See Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 235 (2d Cir. 2006) (New York law); Taylor v. American Chemistry Counsel, 576 F.3d 16, 31 (1st Cir. 2009) (Massachusetts law). Moreover, in addition to the general pleading standards of Fed. R. Civ. P. 8, fraud allegations must be stated with the specificity required by Fed. R. Civ. P. 9. See Fed. R. Civ. P. 9(b) ("in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"); ECA v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).

### 1.   Alleged Failure to Disclose Copying

As it does with its breach of fiduciary duty claim, CSHL asserts a fraudulent concealment cause of action that is duplicative of its claim for malpractice. In its claim for fraudulent concealment, CSHL alleges that Vincent and R&G "intentionally and repeatedly conceal[ed] Vincent's copying of Fire," and that by doing so "committed a fraud upon CSHL." (Compl. ¶ 79.) This is the same allegation that CSHL relies on in its malpractice claim. (Compare Compl. ¶ 80 with Compl. ¶¶ 35, 41.)

Where a plaintiff brings both a legal malpractice and a fraud claim, the fraud claim "is sustainable only to the extent that it is premised upon one or more affirmative intentional misrepresentations—that is something more egregious than *mere concealment or failure to disclose one's own malpractice* . . . which have caused *additional damages, separate and distinct from those generated by the alleged malpractice*." Amadasu v. Ngati, No. 05-CV-

2585(JFB)(LB), 2006 U.S. Dist. LEXIS 19654 * 32 (E.D.N.Y. March 27, 2006) (citations and

quotations omitted) (emphasis added).  As a result, courts routinely dismiss fraudulent

concealment claims where, as here, they are based on an allegation that an attorney failed to

reveal his or her own malpractice. See White of Lake George v. Bell, 251 A.D.2d 777, 778

(N.Y. App. Div. 1998) (concluding that "[t]he cause of action sounding in fraud . . . cannot

stand" where "plaintiff charges defendant with fraud on the basis of the same events, asserting

that defendant concealed his initial malpractice and affirmatively misrepresented the reasons for

the weakness in plaintiff's position in the underlying dispute); Mackley v. Sullivan & Liapakis,

P.C., No. 98-CV-4860 (SWK), 1999 U.S. Dist. LEXIS 6557, * 5 (S.D.N.Y. May 5, 1999)

(dismissing fraud claim as duplicative where plaintiff's alleged fraud based on allegations that

defendants "knowingly misrepresented" and "knowingly failed to disclose information");

Adamson v. Bachner, No. 01-CV-10213 (JSM), 2002 U.S. Dist. LEXIS 21102, *9 (S.D.N.Y.

Oct. 31, 2002) (dismissing fraud claim that was "in essence duplicative of the malpractice

claim," and noting that a separate fraud claim requires proof that "damages resulting from the

fraud are different from or in addition to the damages in the malpractice claim.")  Because

CSHL's fraud claim is based solely on Mr. Vincent's concealment of his alleged malpractice,

and because no additional, separate damages are alleged, the fraud claim should be dismissed.

### 2.   Allegations Regarding Invoices from Mr. Vincent's Company

CSHL alleges that "Vincent committed a separate fraud upon CSHL through his

tendering, through R&G, of invoices from The IP Resource Company totaling at least $9587.45,

all of which were paid by CSHL." (Compl. ¶ 85.)  CSHL further alleges that Vincent "could not

substantiate any work performed by that company for CSHL" (id.); that the invoices were

"material misrepresentations" (id.); that Vincent tendered the invoices "knowing that they were

false, with the intent that CSHL would rely" on them (Compl. ¶ 86); that CSHL did in fact "rely

on" the invoices; and that "[i]n making payment on these fraudulent invoices, CSHL suffered

damages in an amount to be determined at trial, plus punitive damages." (Compl. ¶ 88.)

CSHL's "separate" fraud claim is couched in wholly conclusory terms that are not

entitled to a presumption of truth. See Iqbal, 129 S. Ct. at 1949-52. Instead of providing a

factual basis by which the Court could determine the plausibility of the claim, CSHL resorts to

"threadbare recitals of a cause of action's elements," Iqbal, 129 S.Ct. at 1940, using terms and

phrases such as "knowingly," "material misrepresentation," "knowing they were false," "with the

intent that CSHL would rely on them," and "has suffered damages." (Compl. ¶¶ 85-88.)

Fundamentally, the claim should be dismissed because CSHL fails to allege, and

cannot allege, that it was not reimbursed for the amounts that it paid on the invoices. This Court

can and should conclude based on this conspicuous omission that CSHL has in fact already been

repaid. Accordingly, the Complaint fails to allege the damages necessary to support a fraud

claim. See Spencer Trask Software and Info. Servs. LLC v. RPost Int'l Ltd., 383 F.Supp. 2d 428,

452 (S.D.N.Y. 2003) (Leisure, J.) (granting 12(b)(6) motion to dismiss fraud claim where

plaintiffs "failed to make an adequate allegation of injury under [common law fraud] claims").

In addition, the fact that CSHL has demanded punitive damages does not change the analysis, as

a claim for punitive damages cannot stand without an underlying, viable cause of action. See

Rocanova v. Equitable Life Assurance Society, 83 N.Y.2d 603, 616 (N.Y. 1994) ("[Plaintiff]

cannot recover punitive damages since it is unable to assert an underlying cause of action upon

which a demand for punitive damages can be grounded.")

Here, where CSHL has failed to allege the elements of fraud in a non-conclusory

manner, and where CSHL has not alleged that it has made unreimbursed payments on the

invoices underlying the supposed fraud, there is no cause of action for fraud and the claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant R&G respectfully requests that the Court grant its motion to dismiss.

Dated:  New York, New York
        March 23, 2010

PATTERSON BELKNAP WEBB & TYLER LLP

By: _____
Philip R. Forlenza (prforlenza@pbwt.com)
Nicolas Commandeur (ncommandeur@pbwt.com)
Irena Royzman (iroyzman@pbwt.com)
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Ropes & Gray LLP*