

**SCULLY, SCOTT, MURPHY & PRESSER PC**
INTELLECTUAL PROPERTY LAW

SECURING INGENUITY®

December 13, 2010

The Honorable A. Kathleen Tomlinson
United States Magistrate Judge
United States District Court
100 Federal Plaza
P.O. Box 9014
Central Islip, NY 11722

   Re: Cold Spring Harbor Laboratory v. Ropes & Gray LLP and
      Matthew P. Vincent, CV-10 0661 (ADS)(AKT)

Dear Magistrate Judge Tomlinson:

  On behalf of plaintiff Cold Spring Harbor Laboratory (CSHL), we write asking the Court to compel R&G to produce certain documents responsive to CSHL's document request no. 22: *"All documents concerning discipline, disbarment, intra-firm investigation, criminal investigation, and/or termination of employment of VINCENT in connection with the acts giving rise to the claims in this action"* but limited to documents generated between the time CSHL raised the allegations with R&G in April, 2008 and the time R&G was terminated as counsel in December, 2008, inclusive. R&G has responded that such documents are "protected by the attorney-client privilege, work-product immunity, or other application privilege or immunity belonging to R&G." Your Honor has granted CSHL's permission to bring the present motion. (11/16/10 hearing tr. at 22.) In accordance with L.R. 37.3, the parties conferred in good faith by telephone on December 6th in an effort to resolve this dispute but were unsuccessful.

  During the time CSHL remained as its client, the fiduciary obligations and duty of loyalty that R&G owed to CSHL were paramount over any of its interests to itself as a business. R&G therefore cannot now object to disclosure of information that it should have provided to CSHL at that time, on grounds that such information is now subject to an attorney-client privilege it shares with either its internal or outside counsel. Discovery of such information should, therefore, be ordered.

### I. Statement of Facts

  On April 1, 2008, CSHL in-house counsel met with R&G in its New York offices. (Exh. 1.) The meeting was held to address CSHL's discovery that large portions of the invention description contained in patent applications drafted by R&G to secure patent protection for technology developed by Dr. Gregory Hannon at CSHL ("Hannon applications") were copied without attribution from a rival lab's own published patent application. (*Id.*) This conduct in combination with further negligent acts by Vincent and R&G has thwarted CSHL's efforts to obtain patent protection for Dr. Hannon's inventions. (D.I. 1 at ¶¶ 57-60, 70, 75.)

  Here, R&G had an affirmative duty to do at least two things: (1) provide the Patent Office ("PTO") with the facts and circumstances of Vincent's conduct and (2) report any

investigations of Matthew Vincent's malpractice to CSHL while CSHL was a client of the firm, whether or not R&G perceived a threat of a lawsuit arising from Vincent's conduct. On both counts, R&G failed to do so. First, R&G refused to assist CSHL in disclosing the facts and circumstances of Vincent's conduct to the PTO. Then, after refusing its assistance, R&G violated its ethical obligations to CSHL by conditioning continued representation on CSHL's agreement to an impermissible prospective waiver of liability and also CSHL's agreement that R&G be allowed to shield from CSHL anything it knew or might discover about Vincent's misconduct through further investigations under a cloak of privilege. Because R&G refused to come to CSHL's aid in dereliction of ethical obligations, R&G committed malpractice and breached its fiduciary duty to CSHL, which has compounded the harm caused by Vincent's original malpractice. (D.I. 1 at ¶¶ 57-60, 70, 75.)

The April 1, 2008 meeting was not confrontational or adversarial. CSHL called the meeting to ask R&G to assist CSHL in meeting its duty of candor and good faith in dealing with the PTO under 37 C.F.R. § 1.56 by disclosing the copied text to the PTO and verifying that the copying had occurred without CSHL's knowledge or consent. (Exh. 1.) CSHL also asked that the Hannon applications be reassigned within R&G. (Id.) On April 22nd, R&G general counsel wrote to CSHL responding to the request for assistance made at the meeting. (Exh. 2.) In it, R&G denied any malpractice had occurred. (Id.) It also stated CSHL "was free to seek to change Ropes & Gray lawyers representing you at any time or to terminate Ropes & Gray" but that if R&G was to continue as counsel CSHL had to agree to two conditions. (Id. at 2.) First, R&G was "concerned that it could be asserted that [R&G's] evaluation and continued prosecution of the [Hannon] applications were improperly conducted in an effort to protect the Firm and its lawyers from allegations of malpractice, rather than to represent the best interests of CSHL." (Id.) Accordingly, it demanded that CSHL waive any claim based on conflict of interest in connection with "continued representation." The R&G waiver demand violated DR 6-102, which forbids a lawyer from making "an agreement prospectively limiting the lawyer's liability to a client for malpractice" (Exh. 3) and Patent Rules that similarly prohibits a practitioner from "attempt[ing] to exonerate himself or herself from or limit his or her liability to a client for his or her personal malpractice" (Exh. 4). Ironically, the demand would have also allowed R&G to act in its own interest with impunity. Second, R&G requested that CSHL agree that it not challenge any claims of privilege by R&G regarding "communications" to "address CSHL's assertions." (Exh. 2 at 2.) R&G did so with the intention of being able to shield the facts of any misconduct of Vincent from CSHL[1] – thus ensuring that R&G would not be acting in CSHL's best interest. The demand violated R&G's affirmative duty of communication under EC 7-8 and 9-2 and created a conflict between its own interests and those of CSHL. (Exh. 6.) The letter also did not seek informed consent in that it failed to disclose that 1) R&G had already conducted a factual investigation, including interviews of Vincent and others; 2) facts learned during the investigation; and 3), information concerning CSHL's rights and R&G's obligations under the Rules of Ethics. (See EC 7-8, DR 5-101, Exh. 7.) The letter contained a signature line for CSHL's agreement to the conditions, but CSHL would not agree to sign. (Exh. 2 at 3.)

---

[1] As evidenced now by R&G's reliance on the April 22nd letter as protecting its investigations from disclosure in this suit. (Exhibit 5 at 2.)

In response, CSHL expressed dismay over treatment by its long-time counsel. CSHL wrote that "we do not wish at this time to engage in a debate with R&G as to the merits of any potential malpractice claim" but, rather, "are hopeful that R&G will be able to cure its errors and make any such claim unnecessary." (Exh. 8 at 1.) CSHL reiterated that "[o]ur primary aim . . . [is] to ensure that R&G is prepared to assist CSHL in fully disclosing all relevant information to the Patent Office" and that "we have no intention of dismissing R&G as CSHL's counsel" because 1) "R&G [has] been long-standing patent counsel to CSHL, a relationship we have significantly invested in and valued over the years;" 2) R&G has "direct familiarity . . . with the scientist and technology at CSHL;" 3) R&G has other attorneys "we have worked with" who are "well qualified to continue representing CSHL;" 4) CSHL would incur "significant additional cost . . . if we are forced to retain new patent counsel across the board;" and 5) CSHL had imminent "filing and appeal deadlines" for Hannon and other applications that required R&G's immediate attention. (Id. at 1-2.) CSHL responded that while it would be willing to agree "that R&G's communications with patent agents and outside counsel for the purpose of addressing CSHL's assertions . . . will be protected by the attorney client privilege and/or work product immunity," it would not agree to waive any claim absent an assurance that R&G would assist with disclosing Vincent's actions to the PTO. (Id. at 1.)

That assurance was never provided. And no agreements were reached. Rather, despite imminent patent office deadlines over applications being handled by R&G, it refused to provide any further legal counseling absent an agreement on the waiver (Exh. 9), thus, intentionally prejudicing CSHL in its procurement efforts in the PTO in violation of Section 10.84 of the Consolidated Patent Rules (Exhibit 10). R&G's refusal to provide any further advice also violated Section 10.40 governing withdrawal from representation, which requires a practitioner to petition the PTO for permission to do so. (Exh. 11.) When CSHL refused to provide the waiver, R&G wrote to CSHL on July 2nd in an attempt to unilaterally terminate its representation, also in violation of Section 10.40. (Exh. 12.) In response, CSHL reminded R&G of its responsibilities to CSHL and as a practitioner before the PTO and that immediate transfer of a "substantial majority of its patent applications," many of which were "at critical points in their prosecution," could "risk[] damaging these valuable assets." (Exh. 13.) Although R&G referred to CSHL's position as "silly," it relented and agreed that it would "do what is necessary to act on your behalf in the matters that remain with us while you find new counsel." (Exh. 14.) R&G continued to represent CSHL in matters before the PTO through December 2008 (Exhs. 15-17.)

## II. R&G's Internal Investigation Is Relevant to CSHL's Claim

Not only does CSHL seek damages based on the malpractice of Vincent, but also based on additional damages caused by R&G's improper and unethical refusal to assist CSHL in meliorating the harm caused by Vincent before the PTO and forcing CSHL to seek and retain substitute counsel. The facts as stated have been pleaded. (D.I. 1 at ¶¶ 57-60.) As set forth in its Complaint, germane to both its malpractice and breach of fiduciary duty claims, CSHL alleges that as a result of R&G's refusal it "has spent thousands of dollars on legal fees that would not have been necessary had Vincent and R&G met their duties of care" These fees include: 1) "substantial additional costs that CSHL has incurred resulting from its transfer of prosecution to new counsel and in legal work that new counsel has conducted in an attempt to address the harm

caused by R&G's misconduct to the Hannon Applications;" and 2) "fees paid to R&G that would not have been necessary had Vincent and R&G satisfied their duties of care." (*Id.* at ¶¶ 70, 75.) R&G's intra-firm investigations bear directly on these claims.

### III. R&G's Internal Investigation Is Not Protected from Disclosure

R&G has taken the position that investigations conducted in connection with issues raised by a client are protected from disclosure based on an attorney-client relationship between R&G and itself as in-house counsel. But a firm's fiduciary duty to its client is paramount. Thus, because a firm owes a fiduciary duty to a client, it cannot withhold information relevant to the client's claim on the basis of privilege. *Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 220 F.Supp. 2d 283 (S.D.N.Y. 2002).[2] The strict limitations on privilege to law firm in-house communications was first applied in *In re Sunrise Securities Litigation*, 130 F.R.D. 560 (E.D. Pa. 1989). In that case, the District Court sided with plaintiff shareholders of insolvent bank and ordered privileged documents withheld by the defendant law firm, which served as general counsel for the bank in connection with transactions alleged to lead to insolvency, be submitted to a Special Master for a determination as to whether the privilege did not apply as against the plaintiff. The Court held that the privilege would not apply if the in-house consultation created a conflict of interest: "when a law firm seeks legal advice from its in house counsel, the law firm's representation of itself . . . might be directly adverse to, or materially limit, the law firm's representation of another client, thus creating a prohibited conflict of interest." *Id.* at 597. The Court further held that a "law firm's communication with in-house counsel is not protected by the attorney-client privilege if the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communications." *Id.*

That holding was adopted and extended in *Bank Brussels Lambert*, which squarely controls the disposition of this motion. There, Credit Lyonnaise (Suisse) ("CLS") sought "internal review of representation issues" from third-party defendant law firm in connection with the firm's representation of CLS in a financing transaction that was the subject of a RICO suit between Bank Brussels Lambert and CLS. The internal review was begun at the firm after CLS notified the firm that it would be liable for any liability of CLS in connection with the suit. At the time of the internal review, the firm was acting litigation counsel for CLS in the suit. The internal review included: 1) review of its own liability, including handwritten interview notes and memoranda and other communications from internal general counsel containing legal advice and communications regarding how the firm should conduct themselves vis-à-vis CSL during the pendency of the internal view; and 2) review of its representation of other entities, including conflict checks with respect to the other parties in the litigation and prospective clients. The firm argued that such review was subject to attorney client privilege. But the Court held that a law firm's "perform[ance] [of] its responsibilities under the Code of Professional Responsibility . . . is not protected by the attorney client privilege." Accordingly, the Court ruled that defendant law firm had to produce all communications related to internal review of its representation of CLS. In so holding, the Court recognized "the general reluctance and narrow, grudging application of privilege" in cases involving an attorney and its client and found that the firm's "ethical duty" of

---

[2] This action arises out of federal law, and, thus, federal law governs the application of privilege. *In re Application for Subpoena to Michael I. Kroll*, 224 F.R.D. 326, 328 (E.D.N.Y. 2004) (Spatt, J.)

4

"loyalty" to disclose the results of internal conflict check to its client trumped any interest the law firm had in limiting its liability. *Id.* at 286. The law established by *Bank Brussels Lambert*, in turn, has been widely adopted. *See, e.g., Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 F.R.D. 283 (E.D.Pa. 2002); *Asset Funding Group, LLC v. Adams & Reese, LLP*, 2008 WL 4948835 (E.D. La. Nov. 17, 2008); *Burns v. Hale and Dorr LLP*, 242 F.R.D. 170, 173 (D. Mass. 2007).

As in *Bank Brussels Lambert*, CSHL is entitled to discovery R&G's internal investigations. The investigations were conducted after CSHL raised the issue of Vincent's malpractice but while CSHL was still a client of R&G and are, thus, subject to disclosure as part of R&G's fiduciary obligation to CSHL. *Bank Brussels Lambert*, 220 F.Supp. 2d at 287. The investigations were also made at a time of – and in furtherance of – R&G's ethical lapses in its refusal to assist CSHL before the PTO. Thus, a number of conflicts arise in connection with R&G's investigation that mandate disclosure, including, the conflict between its abiding self-interest in limiting its liability exposure, on the one hand, and its fiduciary duties of communication, loyalty and informed consent to CSHL, on the other. *In re Sunrise Securities Litigation*, 130 F.R.D. at 597. Further, R&G's refusal to provide information concerning the investigation also conflicted with CSHL's (and R&G's) duty of candor before the PTO. Because R&G chose its own interests over its clients, it cannot protect these investigations from disclosure on grounds of privilege.

R&G now cynically defends its claim of privilege by pointing to CSHL's April 28, 2008 letter to R&G (Exh. 5 at 2, referencing Exh. 8.) CSHL requested that R&G cooperate in providing facts to the PTO in accordance with the parties' duty of candor. Assuming R&G would do so, and premised on the condition that R&G would also drop its improper demand for a prospective waiver of liability, CSHL "had no problem agreeing" to R&G's request to keep its communications with its own counsel privileged. R&G, however, never dropped its demand; nor did it ever assist CSHL before the PTO. R&G's interpretation of its April 22, 2008 letter illustrates the deceptive intent it had all along in drafting this proposed agreement, which CSHL never signed. R&G now implausibly claims that CSHL instead consented to allowing R&G to shield forever from CSHL all facts regarding negligent conduct by Vincent, including those very facts that CSHL had asked R&G to investigate and disclose to the PTO. Such an alleged agreement would be unenforceable and for R&G to now interpret the correspondence as such confirms it intended to violate its obligations of communication, loyalty and informed consent to its client.

For the foregoing reasons, CSHL's motion should be granted.

Respectfully submitted,

/Chad E. Ziegler/
Chad E. Ziegler
*Attorney for Plaintiff*