UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COLD SPRING HARBOR LABORATORY,   :

                Plaintiff,      :

          - against -       :

ROPES & GRAY LLP and          :
MATTHEW P. VINCENT,

                           :
          Defendants.

CIVIL ACTION NO. 11-CV-10128-RGS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### DEFENDANT ROPES & GRAY LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

PATTERSON BELKNAP WEBB & TYLER LLP
Sarah Levin Goodstine (BBO # 664112)
Philip R. Forlenza, *pro hac vice*
Nicolas Commandeur, *pro hac vice*
Irena Royzman, *pro hac vice*
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Defendant Ropes & Gray LLP*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

    A.    Dr. Hannon's Alleged Invention and the Prosecution of Patents ............................3

    B.    The PTO Rejected Hannon's Applications on Multiple Bases...............................5

    C.    The PTO Has Consistently Interpreted the Fire Patent in
        Rejecting the Hannon Applications and Applications of Other Scientists. ............6

    D.    Allegations Regarding Defendants' Representation of Other Clients ....................7

        1.    Allegations Regarding RXi.......................................................................8

        2.    Allegations Regarding Insert Therapeutics.................................................8

    E.    Allegations Regarding Mr. Vincent's Termination ................................................9

ARGUMENT ...........................................................................................................................10

I.    The Amended Complaint Should Be Dismissed  Pursuant To Rule 12(b)(6). .................10

    A.    The Amended Complaint Fails to State a Claim for Malpractice.........................10

    B.    The Breach of Fiduciary Duty Claim Fails...........................................................13

        1.    CSHL Fails to Allege a Conflict
                From the Representation of Other Clients. ................................................14

            a.    Allegations Regarding RXi...........................................................14

            b.    Allegations Regarding Insert Therapeutics and Calando...............15

        2.    Failure to Allege Damages.......................................................................16

    C.    The Fraud Claim Should Be Dismissed...............................................................17

        1.    Alleged Failure to Disclose Copying.......................................................18

        2.    Allegations Regarding Invoices from Mr. Vincent's Company ...............18

    D.    The Negligence Claim Should Be Dismissed.......................................................19

CONCLUSION........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Amadasu v. Ngati,
No. 05-CV-2585(JFB)(LB), 2006 U.S. Dist. LEXIS 19654
(E.D.N.Y. March 27, 2006) ...............................................................................18

AmBase Corp. v. Davis Polk & Wardwell,
8 N.Y.3d 428 (N.Y. 2007) (New York law) ......................................................11

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009)..................................................................10, 13, 16, 17

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007)......................................................................10, 13, 16, 17

Cannon v. Sears, Roebuck & Co.,
374 Mass. 739 (Mass. 1978) .............................................................................19

Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.,
25 Mass.App.Ct. 107 (Mass. App. Ct. 1987).....................................................11

Crigger v. Fahnestock and Co., Inc.,
443 F.3d 230 (2d Cir. 2006)..............................................................................18

Ehrens v. Rubin, Weisman, Colasanti, Kajko & Stein, LLP,
24 Mass. L. Rptr. 327, 2008 WL 2895900 (Mass. Super. July 1, 2008). ...............12

Fiduciary Trust Co. v. Bingham, Dana & Gould,
58 Mass. App. Ct. 245 (Mass. App. Ct. 2003).....................................................12

Flutie Bros. LLC v. Hayes,
No. 04 CIV. 4187, 2006 WL 1379594 (S.D.N.Y. May 18, 2006)........................12

Glidden v. Maglio,
430 Mass. 694 (Mass. 2000) .............................................................................19

Hardcastle v. Sebelius,
No. 09-40014-GAO, 2010 WL 2598632 (D. Mass. June 25, 2010)......................20

Hayes v. Hayes,
No. 03-cv-719, 2007 WL 3015118 (Mass. Super. Ct. May 22, 2007),
aff'd by, 72 Mass. App. Ct. 1111 (Mass. App. 2008) ......................................18, 19

Immunocept, LLC v. Fulbright & Jaworski, LLP,
504 F.3d 1281 (Fed. Cir. 2007)..........................................................................11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Johnson v. Nextel Commc'ns., Inc.,*
    No. 09-CV-8473, 2009 WL 928131 (S.D.N.Y. Mar. 31 2009) ...............................13

*Kaempe v. Myers,*
    367 F.3d 958 (D.C. Cir. 2004) .............................................................................3

*LaBelle v. McGonagle,*
    No. 07-CV-12097 (GAO), 2008 WL 3842998 (D. Mass. Aug. 15, 2008) .............11

*Law Practice Mgmt. Consultants LLC v. M&A Counselors & Fiduciaries, LLC,*
    599 F. Supp. 2d 355 (E.D.N.Y.2009) .................................................................13

*Lefkowitz v. Bank of New York,*
    676 F. Supp. 2d 229 (S.D.N.Y. 2009).................................................................14

*Martin v. Applied Cellular Tech.,*
    284 F.3d 1 (1st Cir. 2002).....................................................................................3

*McElroy v. Robinson & Cole LLP,*
    No. 03-P-273, 2004 WL 1292042 (Mass. App. Ct. June 10, 2004) .................13, 17

*Nazarro v. Balber,*
    No. 05-CV-2172, 2005 U.S. Dist. LEXIS 20673 (S.D.N.Y. Sept. 20, 2005)..........13

*Niehoff v. Maynard & Long Ridge Associates L.P.,*
    299 F.3d 41 (1st Cir. 2002)..................................................................................11

*Qestec, Inc. v. Krummenacker,*
    367 F. Supp. 2d 89 (D. Mass. 2005) ...................................................................14

*Robinson v. Bodoff,*
    382 F. Supp. 2d 229 (D. Mass. 2005) .................................................................16

*Seippel v. Jenkens & Gilchrist, P.C.,*
    341 F. Supp. 2d 363 (S.D.N.Y. 2004)..................................................................14

*Sentinel Prods. Corp. v. Platt,*
    No. 98-CV-11143 (GAO), 2002 WL 1613713 (D. Mass. July 22, 2002) ..................11, 16, 19

*Taylor v. American Chemistry Counsel,*
    576 F.3d 16 (1st Cir. 2009)..................................................................................18

*Ulico Casualty Co. v. Wilson,*
    865 N.Y.S.2d 14 (N.Y. 1st Dep't 2008) ...............................................................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Unger v. Paul Weiss Rifkind Wharton & Garrison*,
    696 N.Y.S. 2d 36 (N.Y. 1st Dep't. 1999) ................................................................17

*United States ex rel. Saltzman v. Textron Sys. Corp.*,
    No. 09-11985-RGS, 2011 WL 2414207 (D. Mass. June 9, 2011)..........................10

*Wehringer v. Powers & Hall, P.C.*,
    874 F.Supp. 425 (D. Mass. 1995) ...........................................................................13


### OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ......................................................................................................18

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 10

DAVID PRESSMAN, PATENT IT YOURSELF 181 (13th ed. 2008) ......................................4

http://med.stanford.edu/featured_topics/nobel/fire/...................................................3, 4

Defendant Ropes & Gray LLP ("R&G") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint of Plaintiff Cold Spring Harbor Laboratory ("CSHL") pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

CSHL has sued R&G claiming that the firm and one of its former partners, Matthew Vincent, improperly described an alleged invention of CSHL scientists led by Dr. Gregory Hannon in certain patent applications (the "Hannon Applications"), and that the United States Patent and Trademark Office ("PTO") rejected the claims in those applications as a result. The core premise of CSHL's legal malpractice claim is not only speculative and implausible on its face, it is also flatly contradicted by the indisputable documentary record.

CSHL contends that, unbeknownst to Dr. Hannon and CSHL, Mr. Vincent used text copied from the patent application of another scientist, Dr. Andrew Fire (the "Fire Application"), to describe Dr. Hannon's alleged invention.  CSHL further alleges that this copying led the PTO to conclude that Dr. Hannon's alleged invention was indistinguishable from Dr. Fire's, and therefore unsuitable for patent protection.

But what is critical to this motion, and dooms CSHL's claim, is what CSHL conspicuously omits.  Whereas the Amended Complaint focuses exclusively on the PTO's reliance upon Fire, the decisions rejecting the various Hannon Applications – the same rejections that CSHL cites in its Amended Complaint – rejected the proposed claims not only based on Fire, but also on the separate and independent grounds that Dr. Hannon's alleged invention was not patentable in view of earlier disclosures by other researchers in addition to Dr. Fire.  The Amended Complaint fails even to mention the PTO's reliance upon the disclosures of these other scientists.  Moreover, the Amended Complaint does not even suggest, much less plausibly allege,

that anything Mr. Vincent did led the PTO to conclude that the prior disclosures of these other scientists provided independent bases for rejecting the claims sought in the Hannon Applications. This failure alone means that CSHL cannot meet the causation elements of its malpractice claim.

Even with respect to the PTO's reliance upon Fire in denying the Hannon Applications, which is the focus of the Amended Complaint, CSHL's malpractice claim requires the finder of fact to determine, without any support in the Amended Complaint, (1) that the PTO concluded erroneously that Fire discloses the alleged invention for which CSHL sought patent protection; and (2) that Mr. Vincent's conduct is what caused that supposed error.  Such a considerable and purely speculative leap is incompatible with a claim for legal malpractice, which requires but-for causation.  Indeed, the PTO's understanding of Fire cannot have been caused by Mr. Vincent's actions because the PTO has applied the same understanding of Fire in rejecting patent applications by other scientists who were represented by different counsel.

CSHL's remaining claims should also be dismissed.  CSHL's allegations regarding a supposed conflict-of-interest *vis-à-vis* Mr. Vincent's representation of two companies, Insert Therapeutics, Inc. ("Insert Therapeutics") and RXi Pharmaceuticals Corporation ("RXi") do not state a claim for breach of fiduciary duty.[1]  Once again, CSHL's claims are doomed by what it fails to allege:  that R&G's representation of these other entities was in conflict with its representation of CSHL or that these representations caused any harm to CSHL.  Similarly deficient is CSHL's fraud claim regarding payments of fees to a patent-search company owned by Mr. Vincent called IP Resource Company, as the pleading nowhere alleges that CSHL has not been reimbursed for those fees  Because it suffered no damage, it has no claim.  The Amended Complaint should be dismissed.

_____

[1] The allegations involving Insert Therapeutics also relate to its successor, Arrowhead Research Corporation, and its affiliate, Calando Pharmaceuticals, Inc. ("Calando").

## FACTUAL BACKGROUND

The facts below derive from the Amended Complaint, documents referenced therein, and matters of public record of which this Court may take judicial notice (including PTO filings). *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ("documents recorded by the PTO … are public records subject to judicial notice on a motion to dismiss.")[2]

### A.     Dr. Hannon's Alleged Invention and the Prosecution of Patents

CSHL sought to obtain patent protection for Dr. Hannon's work in the field of RNA interference ("RNAi"). (D.I. 107 ¶ 7.) In general terms, RNAi refers to the cellular process by which double-stranded RNA ("dsRNA") are used to regulate "expression of a cellular gene." (*Id.*) The process is of interest to researchers working to suppress the expression of certain undesirable target genes, such as those associated with cancer. (*Id.*) The study of RNAi is a crowded field in which many prominent scientists are working and making various advances. For example, Dr. Andrew Fire – the scientist whose patent served as one of the bases for the denial of the Hannon Applications – received the 2006 Nobel Prize in Medicine for his discoveries in the field of RNAi. *See* http://med.stanford.edu/featured_topics/nobel/fire/.

According to the Amended Complaint, Dr. Hannon's alleged invention consisted of turning off target genes (via RNAi) in mammalian cells through the use of so-called "short hairpin" RNAs ("shRNAs"). (D.I. 107 ¶ 7.) Mr. Vincent and R&G served as outside patent counsel in the prosecution of the Hannon Applications. (*Id.* ¶¶ 22, 23.)

As set forth in the Amended Complaint, the prosecution of the patent applications relating to Dr. Hannon's alleged invention has been a long process, with much back-and-forth between Mr. Vincent and representatives of CSHL, on the one hand, and the PTO, on the other.

---

[2] Although R&G disputes many of the facts alleged in the Amended Complaint, they are accepted, *arguendo*, as true for purposes of this motion. *See Martin v. Applied Cellular Tech.*, 284 F.3d 1, 5-6 (1st Cir. 2002).

Dr. Hannon "regularly communicated" with Mr. Vincent regarding the applications (D.I. 107 ¶ 31) and he reviewed each of the patent applications before it was filed.  Indeed, Dr. Hannon (along with his four co-inventors) signed declarations under oath that were submitted to the PTO confirming that each application accurately disclosed the work for which they were seeking patent protection.  (Declaration of Philip R. Forlenza ("Forlenza Decl."), Exhs. A-E.)

The crux of CSHL's malpractice claim is its allegation that Mr. Vincent improperly described Dr. Hannon's work in the early patent applications by copying text from the Fire Application and then subsequently relied upon that allegedly improper description.  (D.I. 107 ¶ 27.)  Significantly, CSHL does not contend that there is anything inherently wrong with copying text into a patent application.[3]  Rather, CSHL's claim is that by copying text from the Fire Application, Mr. Vincent "***implied*** that Dr. Hannon's short hairpin RNA technology was either something that Dr. Fire invented or was suggested by the Fire Application."  (*Id.* ¶ 10) (emphasis added).  CSHL asserts that this "unfairly prejudiced [the Hannon Applications] by the ***erroneous perception*** that the technology invented by Dr. Hannon is not sufficiently unique from what the Fire application describes…" (*Id.* ¶ 12) (emphasis added).  Tellingly, CSHL never alleges how Mr. Vincent should have otherwise described the alleged invention, besides repeating the vague mantra that he should have used "original text accurately describing [Dr. Hannon's work]." (*Id.* ¶ 30.)[4]

---

[3] To the contrary, such copying is accepted practice.  *See* DAVID PRESSMAN, PATENT IT YOURSELF 181 (13th ed. 2008) (sold in the PTO's store and relied on by many practitioners) ("If you see any prior-art patent whose specification contains words, descriptions, and/or drawing figures that you can use in your application, *feel free to plagiarize!*  Patents are not covered by copyright and it's considered perfectly legal and ethical to make use of them.").

[4] CSHL continues to prosecute these applications through successor counsel at Wilmer Cutler Pickering Hale and Dorr, LLP (D.I. 107 ¶ 59, *supra* at p. 6 and at p. 6 n.2), and has recently obtained a patent for one of its applications drafted by Mr. Vincent, as well as an allowance of one of the other applications.  *See* U.S. Patent No. 7,732,417 B2; D.I. 100.  As acknowledged by CSHL, these recently allowed claims

**B.      The PTO Rejected Hannon's Applications on Multiple Bases.**

Although the PTO initially allowed one of the Hannon Applications, the PTO

later withdrew the allowance "due to a mistake by the [PTO]" and rejected the claims.  (D.I. 107

¶¶ 38-39; Forlenza Decl. Exh. F at 2).  The PTO provided several bases for its rejection.  In

addition to the Fire reference that is the sole focus of CSHL's Amended Complaint, the PTO

determined that a published patent application describing the work of Dr. Yin-Xiang Li, et al.,

was an anticipatory reference (i.e., that it disclosed all of the subject matter in Dr. Hannon's

sought-after claims) and that a patent issued to Dr. Michael Graham, et al., rendered Dr.

Hannon's claims obvious.  (*Id.* at pp. 8-12; Forlenza Decl. Exh. H at pp. 6-7, 13-15; Forlenza

Decl. Exh. G at 7-8, 14-16.)  The PTO found that the disclosures of ***each*** of these three teams of

scientists (Fire et al., Li et al., and Graham et al.) separately and independently pre-dated Dr.

Hannon's supposed invention – i.e., the expression of short hairpin, double-stranded RNAs in

mammalian cells to effect RNAi (D.I. 107 ¶¶ 7, 29-30) – and rendered it unpatentable.  For

example, with respect to Dr. Li, the PTO noted in rejecting the Hannon Application:

> Li et al disclose a method for attenuating the expression of a target
> gene in a cell comprising introducing into the cell a double
> stranded RNA in an amount sufficient to attenuate expression of
> the target gene… The cell can be a ***mammalian cell*** including a
> human cell.  … The double stranded RNA can be formed from one
> strand to take the form of a self-complementary ***hairpin-type***
> ***molecule*** … ***at least 25 (which includes 25) bases in length*** **[i.e., a**
> **short hairpin]**.

(Forlenza Decl. Exh. G at pp. 7-8 (emphasis added);  *see also* Forlenza Decl. Exh. H at p. 6;

Forlenza Decl. Exh. F at p. 8.)  CSHL does not suggest that Mr. Vincent's alleged malpractice

did anything to contribute to the PTO's determination that the disclosures of these other

scientists besides Dr. Fire precluded the claims in the Hannon Applications.

---

(for use of a library of hairpins) are different from and narrower than the claims at issue in the Amended
Complaint.  (D.I. 100 at 2.)

Subsequent rejections by the PTO of the Hannon Applications – rejections of separate applications and/or of distinct claims (including those asserted in attempts to overcome prior rejections) – have similarly been based upon multiple examples of preclusive disclosures by other scientists.  For example, the most recent rejection from July 2010 of the '086 application relies on another independent ground for rejecting the patent claims sought by CSHL. (*See* Forlenza Decl. Exh. I at pp. 8-9 (maintaining rejection of the claims based on Kruetzer, Dietz, and Kingsman).)  The PTO determined that the work of these other scientists made obvious the claims sought by CSHL.  (*Id.*)

C.     **The PTO Has Consistently Interpreted the Fire Patent in Rejecting the Hannon Applications and Applications of Other Scientists.**

In addition, the Amended Complaint does not provide a factual basis for CSHL's speculation that the PTO's interpretation of Fire (i.e., that it disclosed the invention for which Dr. Hannon sought claims) was caused by Mr. Vincent's actions.  Indeed, the PTO has consistently interpreted the disclosures in the Fire patent in the same fashion when rejecting both (i) the Hannon Applications; and (ii) applications by other scientists who were not represented by Mr. Vincent or by R&G and whose applications did not copy text from Fire.

First, the PTO repeatedly emphasized that Fire pre-dates Dr. Hannon's work and disclosed the claims for which CSHL sought patent protection during the time R&G prosecuted the Hannon Applications.  The PTO rejected the argument made by CSHL in prosecuting the patent applications – reiterated by CSHL in its Amended Complaint (D.I. 107 ¶¶ 20, 32, 44) – that Dr. Fire only disclosed ***long*** double-stranded RNA molecules, not the ***short*** hairpins that are allegedly the focus of Dr. Hannon's work.  Instead, the examiner stated:

> Fire et al. explicitly discloses methods of attenuating expression of a target gene in cells wherein the cells are ***mammalian*** cells, discloses a dsRNA wherein the dsRNA can be formed by a self-

> complementary single stranded RNA *i.e. a hairpin RNA*, discloses
> each strand of the hairpin RNA can be at least 25 nucleotides in
> length *i.e. a short hairpin RNA* ….

(Forlenza Decl. Exh. J at pp. 15-16 (emphasis added); *see also* Forlenza Decl. Exh. H at pp. 3-5;

Forlenza Decl. Exh. G at pp. 5-6.)

Second, the PTO has interpreted Dr. Fire's disclosure in the same way in rejecting

patent applications filed by other influential scientists in the field of RNAi, including those of

Dr. Graham and of Dr. David Engelke (of the University of Michigan) and their respective co-

inventors.  (Forlenza Decl. Exh. K at pp. 4-5; Forlenza Decl. Exh. L at pp. 22-23, 27-28.)  The

PTO rejected the applications by these other scientists as unpatentable in view of Fire

notwithstanding the fact that they were drafted and prosecuted by attorneys other than Mr.

Vincent and did not copy substantial text from Fire.  *Id.*

For example, in rejecting the patent claims of Dr. Engelke's team, the PTO

interpreted Fire just as it did in rejecting the Hannon Applications:

> Fire et al. teach methods of RNA interference in cells by
> administering compositions comprising double stranded RNAs.
> These dsRNAs are complementary to a target gene and … are
> taught as formed from *a single self complementary strand [i.e., a*
> *hairpin].*  Fire et al. teach … that the dsRNA can be *25 base pairs*
> *in length [i.e., a short hairpin].*  Fire et al. teach … that the
> dsRNA of their invention can be made in cells, including
> *mammalian* and human cells…

(Forlenza Decl. Exh. K at pp. 4-5 (emphasis added).)

### D.    Allegations Regarding Defendants' Representation of Other Clients

CSHL's Amended Complaint alleges that Defendants breached a fiduciary duty

owed to CSHL and committed negligence by representing two other companies, Insert

Therapeutics (including its successor Arrowhead Research Corporation and affiliate Calando)

and RXi Pharmaceuticals Corporation.  (D.I. 107 ¶¶ 88-101, 113-120).  As explained below,

CSHL fails to allege that either of these representations constituted a conflict, or that they resulted in damages to CSHL.

### 1.     Allegations Regarding RXi

The sum total of the Amended Complaint's allegations concerning RXi are as follows: R&G was engaged by RXi by February 2007 (D.I. 107 ¶ 71); RXi and CSHL entered into a licensing agreement in March 2007 (*Id*.); Mr. Vincent contacted CSHL's general counsel, John Maroney, in October 2007 to request a waiver of conflicts for R&G to represent RXi as counsel with respect to corporate matters; and CSHL was not aware that R&G was also prosecuting patent applications for RXi.  (D.I. 107 ¶ 72.)  Notably, the Amended Complaint *does not allege*:  that R&G represented either RXi or CSHL in connection with the negotiation or preparation of the parties' license agreement; or that RXi's patent applications competed in the same field as any patent applications filed by CSHL; or that RXi's interests in any way conflicted with CSHL's.

### 2.     Allegations Regarding Insert Therapeutics

The Amended Complaint alleges that Mr. Vincent represented another biotechnology company, Insert Therapeutics, which filed a patent application related to RNAi six months after Mr. Vincent filed one of the Hannon Applications.  (D.I. 107 ¶¶ 61-62.)  While CSHL baldly alleges that Mr. Vincent "co-opted" CSHL's alleged inventions by including them in the Insert Therapeutics application (the "Insert Application"), that allegation is refuted by the face of the Insert Application, in which the Hannon Applications are cited in a background description for Insert Therapeutics' claims that are different than the technologies described by the Hannon Applications.  *Supra* p. 15 (Comparing Forlenza Exh. M. at pp. 2-3 to D.I. 107 ¶¶ 7-8).  It is further belied by CSHL's allegation that Mr. Vincent proposed to Dr. Hannon that

"CSHL and Insert combine patent portfolios" (D.I. 107 ¶ 63.), a proposal that Mr. Vincent never

would have made had he in fact co-opted Dr. Hannon's work for the Insert Application.

CSHL attempts to buttress its insufficient allegations regarding Insert

Therapeutics by describing the licensing of the Insert Application to Calando,[5] a company in

which Mr. Vincent had an ownership interest that CSHL alleges was not disclosed to its

"attorneys or management." (*Id.* ¶ 68.) CSHL does not, and cannot, allege that this relationship

conflicted with CSHL's interests, or that others at CSHL (such as Dr. Hannon) were unaware of

this ownership interest.

Finally, CSHL alleges that Mr. Vincent "approached Dr. Hannon to propose that

CSHL and [Calando] form a new venture for the development and commercialization of short

hairpin RNAi." (*Id.* ¶ 69.) But there is *no allegation* that any relationship was created between

CSHL and Calando; that such a relationship would have been in conflict with CSHL's interests if

it had been created; or that R&G represented any of these entities in connection with such a

relationship. In short, there is nothing about these allegations to support an assertion that R&G

was engaged in representing conflicting interests.

### E.    Allegations Regarding Mr. Vincent's Termination

In April 2009, Mr. Vincent was terminated from R&G, and in July 2009, he

resigned from the Massachusetts Bar as a result of conduct relating to billing clients for patent-

database-search services by a company that he owned (the IP Resource Company) (D.I. 107 ¶¶

75-76), a fact disclosed by Mr. Vincent in an affidavit that he filed with the Massachusetts Board

of Bar Overseers. (*Id.* ¶ 76.) The Amended Complaint alleges that Mr. Vincent "never

---

[5] Specifically, CSHL alleges that Insert Therapeutics was acquired by Arrowhead Research Corporation ("Arrowhead"), which, along with Mr. Vincent, created a company called Calando, (D.I. 107 at ¶ 66); that Calando licensed technology developed by Insert Therapeutics, (*id.* at ¶ 66); and that Calando and Insert Therapeutics merged in 2008. (*Id.* at ¶ 67.)

maintained or did not retain" the billing records for the invoices submitted by IP Resource

Company, that these invoices were submitted to R&G for payment and then billed to the

appropriate client for the services, and that R&G was not aware that Mr. Vincent was the owner

and operator of the IP Resource Company.  (*Id.*)  CSHL also asserts that it paid approximately

$10,000 to R&G for work allegedly performed by the IP Resource Company.  (*Id.* ¶ 77.)

CSHL fails to allege how it has been damaged by payment of these invoices.  In

particular, it does not – and cannot – allege that the amounts paid have not been reimbursed.

CSHL cannot avoid reality through clever pleading.  The Court can, and should, infer from the

lack of such allegations that CSHL has already been reimbursed for the expenditures.

## ARGUMENT

## I.     THE AMENDED COMPLAINT SHOULD BE DISMISSED
##        PURSUANT TO RULE 12(b)(6).

For a complaint to survive a motion to dismiss, it "must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

*Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim has facial plausibility only "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  *See also United States ex rel. Saltzman v.*

*Textron Sys. Corp.*, No. 09-11985-RGS, 2011 WL 2414207, *2, 4 (D. Mass. June 9, 2011)

(Stearns, J.) (granting motion to dismiss where plaintiff's complaint did not contain facts

sufficient to suggest that each element of the pleaded claims were present).

### A.     The Amended Complaint Fails to State a Claim for Malpractice.

A plaintiff seeking to prove legal malpractice must demonstrate three elements:

(1) that the attorney was negligent in the representation; (2) that the client-plaintiff suffered

actual damages; and (3) that the attorney's negligence was the "but-for" cause of those damages.

*Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass.App.Ct. 107, 111

(Mass. App. Ct. 1987) (Massachusetts law); *AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d

428, 434 (N.Y. 2007) (New York law).[6]  To prevail on a claim of legal malpractice in connection

with patent prosecution:

> the plaintiffs must demonstrate that but for [the attorney's] negligence
> they would have received a valid patent with consequent economic
> benefit.  To do so, the plaintiffs would need to establish the patentability
> of their claimed invention ….

*LaBelle v. McGonagle*, No. 07-CV-12097 (GAO), 2008 WL 3842998 at *2 (D. Mass. Aug. 15,

2008).  CSHL's Amended Complaint fails to satisfy these requirements.

Specifically, CSHL has failed to allege that Mr. Vincent's alleged malpractice

(the copying of Fire) caused the PTO to reject the applications.  As an initial matter, CSHL

cannot overcome the fact that the PTO rejected Dr. Hannon's claims not only based on the Fire

patent but also on separate and independent grounds having nothing to do with Fire or the

alleged malpractice.  Although the Amended Complaint focuses exclusively on the PTO's

reliance upon Fire in rejecting the Hannon Applications, the examiners made clear that the

Hannon Applications ***would have been rejected in any event***, based on prior art references

separate and apart from Fire.  *Supra* at pp. 4-7.  The Amended Complaint contains no allegation

---

[6] The Amended Complaint does not specify the applicable law that controls CSHL's claims.  CSHL contends that the Court has federal question jurisdiction (D.I. 107 ¶ 5), presumably because the malpractice claims depend on the resolution of a substantial question of federal patent law.  *See Immunocept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1283 (Fed. Cir. 2007).  Nevertheless, the elements of each cause of action are governed by state law.  *See id.* at 1284-1285.  Massachusetts law should be applied here, as Mr. Vincent was located in Massachusetts, was licensed to practice in Massachusetts, and performed his work in Massachusetts.  *See Sentinel Prods. Corp. v. Platt*, No. 98-CV-11143 (GAO), 2002 WL 1613713 (D. Mass. July 22, 2002) (applying Massachusetts law where attorney performed patent work in Massachusetts).  In any event, because the elements for legal malpractice under Massachusetts law are the same as under New York law (the only other potentially relevant jurisdiction given that CSHL is located there), the Court need not reach this issue.  *See Niehoff v. Maynard & Long Ridge Associates L.P.*, 299 F.3d 41, 48 (1st Cir. 2002).

suggesting that Mr. Vincent's conduct did anything to contribute to the examiners' determination with respect to these other references.  Because the indisputable documentary evidence (i.e., the PTO decisions) confirms that Mr. Vincent's alleged malpractice was not the but-for cause of CSHL's failure to obtain a patent, the malpractice claim fails as a matter of law.  *See, e.g.*, *Ehrens v. Rubin, Weisman, Colasanti, Kajko & Stein, LLP*, 24 Mass. L. Rptr. 327, 2008 WL 2895900, at \*1-2 (Mass. Super. July 16, 2008) (dismissing malpractice action where underlying court's decision was based on an independent reason having nothing to do with the alleged malpractice); *Fiduciary Trust Co. v. Bingham, Dana & Gould*, 58 Mass. App. Ct. 245, 254 (Mass. App. Ct. 2003) (dismissing claim where unrelated bankruptcy caused plaintiffs harm, not any alleged malpractice); *Flutie Bros. LLC v. Hayes*, No. 04 CIV. 4187, 2006 WL 1379594 (S.D.N.Y. May 18, 2006) (same).

Moreover, even with respect to the PTO's rejections based on Fire (the only basis for the PTO's rejections referenced in the Amended Complaint), CSHL cannot establish that "but for" Mr. Vincent's conduct, the PTO would have taken a different view of Fire.  The PTO has repeatedly concluded that Fire discloses the use of short-hairpin RNA to effect RNA interference in mammalian cells (*see supra* pp. 7-9) – i.e., Dr. Hannon's alleged invention.  CSHL's claim thus depends upon the finder of fact determining:  (1) that **each** of the several patent examiners at the PTO who reached the same conclusion regarding the import of Fire got it wrong; and (2) that the PTO **only** made this mistake because Mr. Vincent copied text from the Fire Application into the Hannon Applications.  This is implausible speculation.  Indeed, it would require the fact finder to disregard the fact that the PTO has made the same supposedly mistaken interpretation of Fire's disclosures across several ***different*** patent applications from ***different*** inventors who were not represented by Mr. Vincent or R&G and did not copy text from Fire.

Such an untenable claim should be dismissed.  *See Iqbal*, 129 S.Ct. at 1951 ("Taken as true, these allegations are consistent with [plaintiffs' theory of the case].  But given more likely explanations, they do not plausibly establish this [theory]."); *Twombly*, 550 U.S. at 570 ("[Where plaintiffs] have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

Courts routinely dismiss such speculative legal malpractice claims.  *See Law Practice Mgmt. Consultants LLC v. M&A Counselors & Fiduciaries, LLC*, 599 F. Supp. 2d 355, 359 (E.D.N.Y.2009) ("The Court is unwilling to take the considerable and purely speculative leap that the Plaintiffs would have prevailed in the BVI Litigation before Boston Life went into liquidation if only [the defendant attorney] had timely filed papers in opposition to [the] motion for summary judgment."); *Wehringer v. Powers & Hall, P.C.*, 874 F.Supp. 425, 427-28 (D. Mass. 1995) (dismissing action where plaintiffs allegations could not demonstrate "that he probably would have succeeded in his underlying law suit" while the underlying law suit continued); *Johnson v. Nextel Commc'ns., Inc.,* No. 09-CV-8473, 2009 WL 928131, at * 7 (S.D.N.Y. Mar. 31 2009) ("[Plaintiffs] purely speculate that had defendants not agreed on attorney's fees, plaintiffs might have received more.  …  Such a speculative argument cannot be the basis of a valid claim."); *Nazarro v. Balber*, No. 05-CV-2172, 2005 U.S. Dist. LEXIS 20673 (S.D.N.Y. Sept. 20, 2005) (granting motion to dismiss legal malpractice claim where plaintiff did not allege how defendant attorney's selection of an improper venue damaged plaintiffs). CSHL's legal malpractice claim should be similarly dismissed.

**B.      The Breach of Fiduciary Duty Claim Fails**

To the extent that CSHL's claim for breach of fiduciary duty arises from the same facts as the legal malpractice claim (i.e., the copying of the Fire patent) or the fraud claim (i.e., the IP Resource Company billings) it is duplicative and legally insufficient.  *See McElroy v.*

13

*Robinson & Cole LLP*, No. 03-P-273, 2004 WL 1292042 at *3 n.9 (Mass. App. Ct. June 10, 2004) (concluding that a fiduciary duty claim may be duplicative where it arises out of the same alleged conduct and damages as the alleged malpractice claim); *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 376 (S.D.N.Y. 2004).  To the extent this claim is based upon the alleged "conflicts" from R&G's representation of other clients, the claim is equally unavailing.

>    1.    **CSHL Fails to Allege a Conflict**
>          **From the Representation of Other Clients.**

CSHL's allegations regarding the purported conflicts of interest stemming from R&G's representation of RXi and Insert Therapeutics (and its affiliate Calando) fail to establish a claim for breach of fiduciary duty.  To state such a claim, a plaintiff must show:  the existence of a fiduciary duty, the breach of that duty, and harm caused by that breach.  *See Qestec, Inc. v. Krummenacker*, 367 F. Supp. 2d 89, 97 (D. Mass. 2005); *Lefkowitz v. Bank of New York*, 676 F. Supp. 2d 229, 250 (S.D.N.Y. 2009).  CSHL fails to state a claim because it fails to allege any facts demonstrating that Mr. Vincent or R&G breached any duty owed to CSHL, let along that the non-existent breach caused any harm.

>    a.    **Allegations Regarding RXi**

The allegations regarding RXi fail to allege any conflict of interest.  The relevant allegations are in totality as follows:  (1) CSHL and RXi have a licensing agreement together; (2) R&G represented both CSHL and RXi during the same time period; (3) R&G has represented RXi in prosecuting patent applications; and (4) at some point in October 2007 R&G asked CSHL for a waiver of conflicts relating to R&G's representation of RXi as corporate counsel.  (D.I. 107 ¶¶ 71-73.)  But these allegations do not amount to any breach of Mr. Vincent's ethical duties to CSHL.  For example, CSHL *does not allege* that R&G simultaneously represented CSHL and/or RXi in connection with the parties' licensing agreement; that R&G ever represented RXi in

prosecuting a patent application based on information obtained from CSHL or that otherwise

conflicted with CSHL's interests; that R&G represented CSHL in an area where CSHL and

RXi's interests conflicted; or that any problem of any type ever arose from the situation.  CSHL

has not alleged a breach of any duty owed to it, and this claim should be dismissed.[7]

### b.     Allegations Regarding Insert Therapeutics and Calando

With regard to Insert Therapeutics and Calando, the gravamen of CSHL's

Amended Complaint is a vague allegation that R&G somehow "co-opted" CSHL's alleged

inventions and used them in the Insert Application for Insert Therapeutics' benefit, and later

Calando's benefit as Insert Therapeutics' licensee.  (D.I. 107 ¶¶ 62, 93.)  According to the

Amended Complaint, the alleged "co-option" consisted of "including CSHL-derived subject

matter in the invention disclosure of the [Insert Application], including subject matter relating to

a 'hairpin' of '19-30 base pairs in length.'"  (D.I. 107 ¶ 93.)  In fact, the only "CSHL-derived

subject matter" that *is* included in the Insert Application is a cite to two published articles by

CSHL scientists (including Dr. Hannon) that were referenced in describing the background of the

work that had *preceded* Insert Therapeutics' discovery.  (Forlenza Decl. Exh. M at p. 2.)  CSHL

can have no objection to the citation of one of its published articles.  Moreover, the Insert

Application could not have "co-opted" Dr. Hannon's alleged invention because it does not seek

patent protection for the alleged invention that CSHL claims as Dr. Hannon's.  The Insert

Application was directed to a method of *delivering* certain RNAi molecules to tissues of interest

(Forlenza Exh. M. at pp. 2-3), while the Hannon Applications are allegedly directed to using

short-hairpin RNA in mammalian cells to obtain RNAi.  (D.I. 107 ¶¶ 7-8.)  Finally, the

---

[7] CSHL's implication that R&G concealed from CSHL that it was acting as RXi's patent prosecution counsel is also insufficient to state a claim, as CSHL does not allege that R&G had any duty to make this disclosure.  Moreover, the allegation is implausible as Dr. Hannon (of CSHL) was a founder of RXi and sat on RXi's Scientific Advisory Board.  *See* SEC Filings for RXi (Forlenza Decl. Exh. N at p. 2, 96, 99).

allegations that "Vincent approached Dr. Hannon" twice, once in 2004 and once in 2006, about possible ventures between CSHL and Insert Therapeutics or Calando (D.I. 107 ¶¶ 63, 69) renders implausible any suggestion that the application "co-opted" Dr. Hannon's own alleged invention. *See Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 570.

### 2. Failure to Allege Damages

The breach of fiduciary duty claim fails for the independent reason that CSHL has failed to allege any damages stemming from the purported conflicts of interest. "[F]or a client to sue his attorney successfully for breach of fiduciary duty he must be able to show that the breach caused him some harm." *Sentinel Prods. Corp. v. Platt*, No. Civ.A.98-11143, 2002 WL 1613713 at *2 (D. Mass. July 22, 2002); *see also Robinson v. Bodoff*, 382 F. Supp. 2d 229, 234 (D. Mass. 2005) ("Plaintiff has not sufficiently alleged that he suffered damages as a result of the alleged conflict of interest and common sense indicates that such damage could not occur.").

CSHL does not allege that R&G's representation of RXi, Insert Therapeutics, or Calando, or Mr. Vincent's alleged interest in Calando, in any way affected R&G's prosecution of the Hannon Applications. In other words, CSHL does not assert that any alleged conflict of interest caused R&G to favor the interests of another client over those of CSHL or to shortchange CSHL in any way. This is fatal to CSHL's claim. *See Sentinel Products*, 2002 WL 1613713 at *4 (dismissing claim for breach of fiduciary duty where plaintiff "has not offered evidence to prove that [defendants] intentionally or inadvertently pulled their punches in prosecuting [plaintiff's] applications or otherwise failed to vigorously represent [plaintiff's] interest.").

And while CSHL argues that it should be awarded three types of damages from the Court, none of these damages has any connection to its allegations of a conflict of interest: (i) lost licensing revenue; (ii) legal fees paid to successor counsel; and (iii) disgorgement of legal

fees paid to R&G.  (D.I. 107 ¶ 101.)  With respect to its claim for lost licensing revenue, CSHL

asserts in conclusory fashion that "[h]ad Vincent and R&G satisfied their duties of care, Insert

and Calando would have come to CSHL to obtain a license of the Hannon technology."  (D.I.

107 ¶ 99.)  CSHL does not provide any plausible factual basis for this assertion, as required by

*Iqbal*, 129 S. Ct. at 1949.  Indeed, CSHL does not allege that Insert Therapeutics or Calando

would have infringed any of the claims of the Hannon Applications, and thus needed a license.

CSHL's allegations thus fail to establish that it is "conceivable," let alone "plausible," that CSHL

lost any licensing revenue as a result of the purported conflict of interest.  *Twombly*, 550 U.S. at

570.  CSHL's second category of claimed damages for the breach of fiduciary duty – fees paid to

successor patent counsel – has no connection to the allegations regarding conflicts of interest.

Finally, CSHL's third category of damages, for disgorgement of R&G's fees, does not establish

the type of damages necessary to sustain a claim for breach of fiduciary duty.  Even assuming

CSHL had alleged an actual conflict (it has not) it would only be entitled to a return of fees if it

had suffered actual damage.  *See McElroy*, 2004 WL 1292042 at *3.  CSHL has alleged no such

damage, and its claim should be dismissed for this additional reason.[8]

### C.       The Fraud Claim Should Be Dismissed.

CSHL describes two separate supposed frauds.  (D.I. 107 ¶ 85.)  The first stems

from the same conduct that CSHL alleges gives rise to its malpractice claim; namely, Mr.

Vincent's purported failure to disclose that some of the information in the Hannon Applications

was copied from the Fire Application.  The second stems from a claim totally unrelated to the

---

[8] This is true whether the Court applies Massachusetts or New York law to this claim.  *Compare supra*  at pp. 16-17 (discussing Massachusetts law), *with Ulico Casualty Co. v. Wilson*, 865 N.Y. S.2d 14, 21-22 (N.Y. 1st Dep't 2008) ("To recover under a claim for damages against an attorney arising out of the breach of the attorney's fiduciary duty, the plaintiff must establish the 'but for' element of malpractice, irrespective of how the claim is denominated in the complaint."); *Unger v. Paul Weiss Rifkind Wharton & Garrison*, 696 N.Y.S. 2d 36, 37 (N.Y. 1st Dep't. 1999) ("[A]n attorney's failure to disclose a conflict of interest is not actionable absent allegations that such a failure proximately caused actual damages").

underlying patent applications, concerning CSHL paying bills for the services of Mr. Vincent's private company.  Because CSHL's allegations do not state fraud or fraudulent concealment claims under either set of facts, these claims should also be dismissed.

To set forth a claim for fraud, a plaintiff must establish all of the following elements:  (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; and (4) reasonable reliance on the part of the plaintiff (5) resulting in damage to the plaintiff.  *See Taylor v. American Chemistry Counsel*, 576 F.3d 16, 31 (1st Cir. 2009) (Massachusetts law); *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 235 (2d Cir. 2006) (New York law).  Fraud allegations must also be stated with the specificity required by Fed. R. Civ. P. 9(b).

### 1.       Alleged Failure to Disclose Copying

CSHL's allegation that Defendants concealed Mr. Vincent's copying of the Fire Application is the same allegation that CSHL relies on in its malpractice claim, (*compare* D.I. 107 ¶¶ 104-105 *with* D.I. 107 ¶¶ 35, 41), and dismissal is therefore appropriate on the same grounds as the dismissal of the malpractice claim.  *See, e.g., Hayes v. Hayes*, No. 03-cv-719, 2007 WL 3015118, at *5 (Mass. Super. Ct. May 22, 2007) (dismissing fraudulent misrepresentation claim where plaintiff "describe[d] no misrepresentation other than defendants' alleged failure to fulfill their duties as her attorneys"), *aff'd by*, 72 Mass. App. Ct. 1111 (Mass. App. 2008); *Amadasu v. Ngati*, No. 05-CV-2585(JFB)(LB), 2006 U.S. Dist. LEXIS 19654, at * 32 (E.D.N.Y. March 27, 2006) (concluding that "mere concealment or failure to disclose one's own malpractice" is insufficient to state a claim for fraud).

### 2.       Allegations Regarding Invoices from Mr. Vincent's Company

CSHL alleges that "Vincent committed a separate fraud upon CSHL through his tendering, through R&G, of invoices from The IP Resource Company totaling at least $9587.45,

all of which were paid by CSHL." (D.I. 107 ¶ 85.) CSHL further alleges that Vincent "could

not substantiate any work performed by that company for CSHL" (*id.*); that the invoices were

"material misrepresentations" (*id.*); that Vincent tendered the invoices "knowing that they were

false, with the intent that CSHL would rely" on them (*Id.* ¶ 86); that CSHL did in fact "rely on"

the invoices; and that "[i]n making payment on these fraudulent invoices, CSHL suffered

damages in an amount to be determined at trial, plus punitive damages." (*Id.* ¶ 88.)

      Fatal to CSHL's claim is what it does not allege. Specifically, CSHL fails to

allege, and cannot allege, that it was not reimbursed for the amounts that it paid on the invoices.

This Court can and should infer based on this conspicuous omission that CSHL has in fact been

reimbursed. Accordingly, the Amended Complaint fails to allege the damages necessary to

support a fraud claim. *See Hayes*, 2007 WL 3015118.

      **D.**    **The Negligence Claim Should Be Dismissed.**

      CSHL also asserts a cause of action for negligence against R&G, purportedly for

its failure to supervise adequately and prevent Mr. Vincent's alleged malpractice, breach of

fiduciary duty, and fraud. (D.I. 107 ¶ 114-115.) With respect to all of these allegations, as

explained above, because CSHL has failed to plead that Mr. Vincent's alleged conduct caused

CSHL any harm, there can be no liability against R&G. *See Sentinel*, 2002 WL 1613713, *2

("[c]ausation is an essential element" of any claim against an attorney for negligence) (quoting

*Glidden v. Maglio*, 430 Mass. 694, 696 (Mass. 2000)); *Cannon v. Sears, Roebuck & Co.*, 374

Mass. 739, 742 (Mass. 1978) ("negligence requires that both negligence and harm be shown,

with a causal connection between these two elements."). With respect to the alleged negligence

as it relates to the fiduciary duty and malpractice claims, CSHL's pleading also fails because it

has not adequately pleaded that R&G and Mr. Vincent committed malpractice, or breached a

fiduciary duty. *Supra* at pp. 11-17.  For all of these reasons, the negligence claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant R&G respectfully requests that the Court grant its motion to dismiss.  Moreover, because CSHL has failed, despite two attempts to articulate a sufficient claim, the dismissal should be with prejudice.  *See Hardcastle v. Sebelius*, No. 09-40014-GAO, 2010 WL 2598632 (D. Mass. June 25, 2010).


Dated:  New York, New York
      August 24, 2011

PATTERSON BELKNAP WEBB & TYLER LLP

By: */s/ Sarah Levin Goodstine*       .
Sarah Levin Goodstine (BBO # 664112)
Philip R. Forlenza, *pro hac vice*
Nicolas Commandeur, *pro hac vice*
Irena Royzman, *pro hac vice*
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Defendant Ropes & Gray LLP*

.