UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
-----------------------------------------------------------------x
COLD SPRING HARBOR LABORATORY,
                      Plaintiff

        v.                                    11-cv-10128 (RGS)


ROPES & GRAY LLP and
MATTHEW VINCENT

                        Defendants
-----------------------------------------------------------------x


**PLAINTIFF COLD SPRING HARBOR LABORATORY'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................1

II.   FACTUAL BACKGROUND....................................................3

      A. Facts Relating to Malpractice ..........................................4

      B. Facts Relating to Conflict of Interest ...............................7

III.  ARGUMENT..............................................................................8

      A. The Malpractice Claim Survives a Motion to Dismiss....8

          1.  Causation Should Not Be Decided
              On a Motion to Dismiss ...........................................8

          2.  Other Cited References Provide Further
              Evidence of Prejudice And Are Not
              Independent, Intervening Causes Of
              CSHL's Failure to Obtain Patent Protection..............10

          3.  CSHL Can Demonstrate That But For
              Defendants' Conduct the PTO Would Have
              Allowed Claims to Issue Over Fire............................12

      B. CSHL Properly Alleges a Breach of Fiduciary Duty.......12

          1.  R&G's Representation of RXi Was in
              Direct Conflict with Its Representation of
              CSHL and Supports Its Breach of the
              Duty of Loyalty Claim ...............................................13

          2.  R&G's Representation of Insert and
              Calando Was in Direct Conflict with
              Its Representation of CSHL and Supports
              Its Breach of the Duty
              Of Loyalty Claim ........................................................14

          3.  The Claim for Breach of Fiduciary Duty
              Properly Alleges Damages ........................................15

## TABLE OF CONTENTS

**Page**

C.  CSHL's Fraud Claims Survive a
Motion to Dismiss.................................................................17

    1.  Failure to Disclose Copying.......................................17

    2.  Invoices from Vincent's Company............................18

D.  Negligence Against R&G .......................................................18

IV.    CONCLUSION.........................................................................19

# TABLE OF AUTHORITIES

## CASES

**Page**

*Amadasu v. Ngati*, 2006 WL 842456, 2006
U.S. Dist. LEXIS 19654 (E.D.N.Y. March 27, 2006) ....................................................17

*Anderson v. Nassau Cnty. Dep't. of Corr.*,
376 F. Supp. 2d 294 (E.D.N.Y. 2005) ..........................................................................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................9, 15

*Credit Suisse-AOL Securities Litigation*,
465 F. Supp. 2d 34 (D. Mass. 2006) .............................................................................8

*Curran v. City of Boston*,
777 F. Supp. 116 (D. Mass. 1991)................................................................................8

*Davis v. Brouse McDowell, L.P.A.*,
596 F.3d 1355 (Fed. Cir. 2010)....................................................................................9

*Emergent Capital Inv. Mgmt.t, Inc. v. Stonepath Group, Inc.*,
343 F.3d 189 (2d. Cir. 2003)........................................................................................8

*Landmark Screens, LLC v. Morgan, Lewis & Bockius LLP*,
2008 WL 4483817, 2008 U.S. Dist. LEXIS 87646 (N.D. Cal. Oct. 2, 2008) .................18

*Protter v. Nathan's Famous Sys., Inc.*,
904 F. Supp. 101 (E.D.N.Y. 1995) ...............................................................................8

*St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch LLP*,
233 F. Supp. 2d 171 (D. Mass. 2002).............................................................................9

*Sentinel Prods.Corp. v. Platt*,
2002 WL 1613713, 2002 U.S. Dist. LEXIS 13217 (D. Mass. July 22, 2002) .................16

## Statutes and Other Authorities

Mass. Rules of Prof'l Conduct, Rule 1.7 (2011).............................................................13

N.Y. Lawyer's Code of Prof'l Responsibility, DR 5-101; EC 7-8 ...................................13

**Statutes and Other Authorities**         **Page**

FED. R. CIV. P. 12(b)(6) ............................................................................. 1, 2, 8, 9, 15, 16

FED. R. CIV. P. 9(b) ........................................................................................................17, 18

35 U.S.C. §102 ......................................................................................................................12

FED. R. EVID. 702 ...................................................................................................................5

FED. R. EVID. 802 ...................................................................................................................5

FED. R. EVID. 901 ...................................................................................................................5

Plaintiff Cold Spring Harbor Laboratory ("CSHL") hereby opposes Defendants' Ropes & Gray's ("R&G") and Matthew Vincent's ("Vincent") Motions to Dismiss the Amended Complaint pursuant TO FED. R. CIV. P. 12(b)(6).

## I.    INTRODUCTION

In 1999, CSHL scientist Dr. Gregory Hannon began research that rapidly lead to his invention of a breakthrough technology that, in simplest terms, allows researchers to turn genes "off" in mammalian cells and animals. (*See generally*, Amended Complaint, D.I.# 107 ("Amended Complaint"), at ¶¶ 7, 18.)   CSHL and Dr. Hannon entrusted Defendants Ropes & Gray (R&G) and its former partner Matthew Vincent with securing patents to Dr. Hannon's invention.  As CSHL's patent counsel, Vincent was responsible for drafting an original description of Dr Hannon's invention distinguishing his invention from what others have already done or described in the prior art.  Vincent failed to perform this fundamental responsibility.  In drafting Dr. Hannon's patent applications, Vincent instead resorted to copying large portions of a published patent application describing older technology (the Fire application). (*Id.* at ¶¶ 9, 27, 44.)   Compounding his negligent drafting, Vincent expressly (but erroneously) directed the patent examiner during prosecution to the copied Fire text as purportedly describing Dr. Hannon's different invention. (*Id.* at ¶¶ 35, 36.)

The "short hairpin" technology Dr. Hannon invented represented a breakthrough over the prior art.  (*See, e.g.*, Declaration of Peter I. Bernstein ("Bernstein Decl."), Ex. A, Response to August 30, 2010 Non-Final Office Action).  Vincent knew or should have known that merely copying prior art text would never serve to describe the innovative features of Dr. Hannon's new approach.  It did not. Vincent's slipshod work: 1) failed to show the PTO how Dr. Hannon's invention is distinguishable from the prior art, including, but not limited to, the Fire patent

1

(Amended Complaint at ¶ 42); 2) thwarted CSHL's efforts to obtain "short hairpin" claims through the erroneous perception that Dr. Hannon had not invented anything new (*Id.* at ¶ 45); and 3) failed to provide proper priority support for such claims (*Id.* at ¶ 33). As result of Vincent's negligence, the Hannon applications have languished in examination for a decade.

Defendants improperly seek dismissal of CSHL's complaint by factually arguing the extent to which Vincent's negligence delayed or prevented issuance of claims directed to Dr. Hannon's short hairpin technology. But such factual arguments as to causation have no merit in a Rule 12(b)(6) motion to dismiss. Nonetheless, having billed CSHL more than half a million dollars, Defendants now cynically contend Dr. Hannon was never entitled to a patent in the first place and that their mishandling of CSHL's patent applications was therefore completely excusable because it was not the "but for" cause of CSHL's failure to obtain patent claims.

Much of Defendants' argument relies on a misreading of CSHL's complaint. According to Defendants, the only prejudice alleged by CSHL was limited to the PTO's rejection of short hairpin claims based on Fire. On the contrary, Vincent's negligence caused far more damage. Vincent's negligent prosecution left CSHL both with a compromised patent application and an erroneous perception within the PTO that Dr. Hannon's short hairpin technology had already been developed by others. The lack of a properly drafted disclosure has frustrated CSHL attempts to explain to the Patent Office the patentable distinctions between Dr. Hannon's short hairpin RNA technology and the prior art and, thus, overcome rejections based on Fire as well as other prior art. The specific references in CSHL's Amended Complaint to the PTO's rejections based on Fire merely illustrate one example of how Defendants' conduct severely compromised CSHL's ability to obtain allowance of claims to the technology Dr. Hannon invented. The basis

for CSHL's claims extends well beyond evidence relating to the rejections over Fire. If there is any doubt to that in Defendants' minds, it should be dispelled now.

With respect to the remaining claims for breach of fiduciary duty and negligence, Defendants' motion is also based on factual issues of causation. Because these issues are not amenable to disposition on a Rule 12 motion to dismiss, Defendants motion as to these remaining claims should also be denied.

## II.     FACTUAL BACKGROUND

Founded in 1890, CSHL is a private, not-for-profit research and education institution at the forefront of efforts in molecular biology and genetics to generate knowledge that will yield better diagnostics and treatments for cancer, neurological diseases and other major causes of human suffering. (Amended Complaint at ¶ 13.) CSHL has been home to eight Nobel Laureates, including James D. Watson who, along with Francis Crick, discovered the double-helical structure of DNA. (*Id.* at ¶ 14.) Today, CSHL is one of the world's most influential cancer research centers. (*Id.* at ¶ 14.)

Inventor Dr. Gregory Hannon is a Professor and Howard Hughes Medical Institute Investigator at CSHL. (*Id.* at ¶ 7.) The Hannon Laboratory at CSHL is focused on the study of a cellular mechanism called RNA interference ("RNAi") and the application of RNAi as a cancer research tool. (Amended Complaint at ¶¶ 7, 18.) Generally, RNAi refers to the process by which double stranded RNA functions to help regulate when genes are turned off and on in the cell. (*Id.* at ¶ 7.) Through his work at CSHL, Dr. Hannon developed inventive methods and technologies to exploit RNAi as a research tool in mammalian cells, which Dr. Hannon achieved by engineering RNA molecules called short hairpin RNAs (shRNAs). (*See id. See also generally* Bernstein Decl., Ex. A at 5-11.) Importantly, the particular structure of these

3

engineered RNA molecules, when stably expressed within a mammalian cell, allowed them to effectively regulate gene expression without having a deleterious, toxic effect on the cell. (*See* Amended Complaint at ¶ 29, Bernstein Decl., Ex. A at 9-10.)

Dr. Hannon's discovery was a breakthrough advance over other prior art, including the long-stranded RNA technology developed by Dr. Andrew Fire ("Fire"), which failed to provide a solution to how one could use RNA interference in mammalian cells without killing the cells, among other deficiencies. (*See* Amended Complaint at ¶¶ 7, 29; Bernstein Decl., Ex. A at 8-11.) Dr. Hannon's 2002 *Genes & Development* paper, "Short Hairpin RNAs (shRNAs) induce sequence-specific gene silencing in mammalian cells" reported much of the work underlying the presently claimed invention.  For the four years after it was published, it was one of the most highly cited papers in molecular biology and genetics. (*See* Bernstein Decl., Ex. A at 11; *id.*, Ex. B, March 22, 2011 Interview Slides at 17.)  Dr. Hannon's research on RNA interference was recognized by Science magazine as the Breakthrough of the Year in 2002 and in 2005 by Esquire as a Breakthrough of the Decade.  (Amended Complaint at ¶ 18; Bernstein Decl., Ex. A at 10-11.)  Since Dr. Hannon's invention, use of shRNA for gene silencing and regulation has become a valuable and widely adopted technology, which is used today in many different fields of medical and pharmaceutical research.  (Amended Complaint at ¶ 17; Bernstein Decl., Ex. A at 10-11.)

## A.     Facts Relating to Malpractice

CSHL's complaint contains over 50 paragraphs of detailed allegations relating to the claim for malpractice, none of which are disputed by Defendants in their motion. Well beyond simple notice pleading, the Complaint explains in great detail, how R&G, and Vincent in

particular, committed malpractice through their failure to conduct the prosecution according to a reasonable standard of care.

As alleged, Vincent copied 11 pages of text from a patent application published by Fire ("Fire application") relating to Dr. Fire's long-stranded RNA technology into the Hannon applications.[1] (Amended Complaint at ¶¶ 9, 24.)  About one-half of the "Detailed Description" of the invention section of the Hannon applications consisted of text copied verbatim from the Fire application.  (*Id.* at ¶¶ 9, 27.)  By merely copying text from the Fire application, Vincent failed to describe critical distinctions between Dr. Hannon's shRNA technology and the prior art, which had provided no solution for how to successfully exploit RNA interference to regulate gene expression in mammalian cells.

To make matters worse, Defendants relied on and misrepresented the copied text of Fire as describing Dr. Hannon's invention in statements before the PTO (*Id.* at ¶¶ 35, 36.) Defendants made these misstatements knowing they would have to eventually distinguish Fire during prosecution once the PTO became aware of it.  (Amended Complaint at ¶ 28.)

The patent examiner relied on these very representations in issuing a notice of allowance of claims of one of the pending Hannon applications in 2005.  (*Id.* at ¶ 38.)  But Defendants' negligent prosecution finally caught up with them.  As CSHL anticipated the issuance of claims, an event that ordinarily follows a notice of allowance, the examiner instead abruptly withdrew

---

[1] Arguing that the acts giving rise to the malpractice were not a breach of the standard of care for a patent practitioner, Defendants cite – but do not attach – an opinion in the form of hearsay from a book entitled PATENT IT YOURSELF.  (R&G's Memorandum of Law in Support of Its Motion to Dismiss the Amended Complaint ("Defs. Memo.") at 4, fn. 3.)  This layperson's reference, which purportedly states that copying is an accepted practice in patent drafting because patents are not copyrightable, does not address the professional standard of care.  Here, the unattached book, directed towards the non-professional, does not pass muster under any of FED. R. EVID. §§ 702, 802, and 901.

the claims from allowance. Instead, the examiner issued a new office action rejecting each of the

pending claims as anticipated, for the first time, by the Fire patent. (*Id.* at ¶ 39.) In that office

action, the PTO specifically noted that the disclosure in the Hannon application was "essentially

verbatim" of the disclosure of Fire and that it was "unclear how applicants' claimed invention

differs from what has been disclosed by the prior art." (*Id.* at ¶ 42.)

In February 2008, CSHL conducted a detailed review of Vincent's prosecution of the

Hannon applications, which included a review of the September 4, 2007 office action and a

detailed comparison of the Hannon and Fire specifications. (*Id.* at ¶¶ 50-53.) This was the first

time CSHL learned of Defendants' negligent and fraudulent acts. (*Id.* at ¶ 12.)

After the investigation, and in order for CSHL to meet its duty of candor and good faith

dealing with the PTO, CSHL approached defendant R&G for assistance in providing the PTO

with all relevant facts. (*Id.* at ¶¶ 57-59.) R&G refused to assist CSHL without a signed waiver

releasing it from any prospective liability, which CSHL declined to do. (Amended Complaint at

¶ 59.)

CSHL continues with new counsel to prosecute pending claims of certain of the Hannon

Applications before the PTO. (*Id.* at ¶ 59.) The claims are directed to methods that allow one to

stably suppress gene expression in mammalian cell using shRNA. (*Id.* at ¶ 29.) Because of

Vincent's failure to properly describe Dr. Hannon's invention, CSHL has been forced to submit

substantial evidence to the PTO to demonstrate how Dr. Hannon's shRNA methods represented a

considerable advance over the prior art, including the Fire patent. (*See, e.g.,* Bernstein Decl.,

Exs. A; B; and C, Second Declaration of Professor Nouria Hernandez, Ph.D.). Due to these

efforts, the U.S. Patent Office has recently issued a notice of allowance of these claims. (*See*

Bernstein Decl., Ex. D, Notice of Allowance.) Moreover, in part by presenting similar evidence

to the European Patent Office (EPO), CSHL has been granted claims in Europe directed to Dr.

Hannon's short hairpin RNA invention. (Bernstein Decl., Ex. E, European Patent Bulletin at 694-

95).

## B.   Facts Relating to Conflict of Interest

Vincent was retained by Insert Therapeutics, Inc. ("Insert") without CSHL's knowledge

or consent and, as patent prosecution counsel for Insert.  Vincent co-opted the shRNA inventions

of Dr. Hannon for the benefit of Insert by including them in Insert's patent application.

(Amended Complaint at ¶¶ 61, 62.)  Vincent later approached CSHL to propose a business

venture between CSHL and Insert without disclosing his relationship with Insert.  (*Id.* at ¶ 63.)

Vincent and others formed Calando Pharmaceuticals Inc. the purpose of which was to

exclusively license Insert's purported technologies, including the shRNA technology developed

by Dr. Hannon and co-opted by Vincent.  (*Id.* at ¶ 66.)  Vincent later approached CSHL to

propose a business venture between CSHL and Calando without disclosing his relationship with

Calando.  (*Id.* at ¶ 69.)

Beginning as late as February, 2007, R&G was retained by RXi Pharmaceuticals without

CSHL's knowledge or consent. (Amended Complaint at ¶ 71.)  In March, 2007 CSHL and RXi

entered into a license agreement concerning Dr. Hannon's shRNA technology but R&G never

sought a waiver of conflict until later in October, 2007. (*Id.* at ¶¶ 71, 72.)  When seeking the

waiver, R&G never informed CSHL that R&G had been acting as RXi's counsel since before the

license agreement was entered. (*Id.* at ¶ 73.)

### III.    ARGUMENT

#### A. The Malpractice Claim Survives a Motion to Dismiss

Defendants' seek to dismiss CSHL's malpractice claim by disputing the factual basis of

CSHL's allegations.  Essentially, the gist of their argument is that 1) the Hannon applications

were properly rejected based on Fire and other references and, thus, the alleged malpractice was

not the "but-for cause of CSHL's failure to obtain a patent on Dr. Hannon's alleged invention"

(Defs. Memo. at 16-17); and 2) CSHL cannot establish "that 'but for' Mr. Vincent's conduct, the

PTO would have allowed Dr. Hannon' patent claims." (*Id.* at 17.)  Not only is such a factual

attack is improper under rule 12(b)(6), it is based on a misinterpretation of CSHL's complaint

and of the underlying facts.

#### 1.  Causation Should Not Be Decided on a Motion to Dismiss

The factual arguments raised by Defendants' motion are unavailing on a motion to

dismiss[2].  Whether "intervening events can break the causal chain" is a "factual matter not

appropriate for a 12(b)(6) motion to dismiss." *Credit Suisse-AOL Securities Litig.*, 465 F. Supp.

2d 34, 46 (D. Mass. 2006). *See Curran v. City of Boston*, 777 F. Supp. 116, 123 (D. Mass.

1991)("The question of proximate cause is a question of fact, and this court will not base a

motion to dismiss upon such an issue"); *See also Emergent Capital Inv. Mgmt, Inc. v. Stonepath

Group, Inc.*, 343 F.3d 189, 197 (2d. Cir. 2003)(Causation is "a matter of proof at trial and not to

be decided on a Rule 12(b)(6) motion."); *Protter v. Nathan's Famous Sys., Inc.*, 904 F. Supp.

101, 110 (E.D.N.Y. 1995) ("To the extent that the plaintiff's business woes were the result of

---

[2] For example, defendants argue that rejections based on references other than Fire during
prosecution of the Hannon applications are independent, intervening causes that break the link
between Defendants' misconduct and CSHL's failure to thus far obtain patent protection. (*Id.* at
10-12.) Defendants further argue that the PTO has "repeatedly concluded that Fire discloses the
use of short hairpin RNA . . . ." (*Id.* at 12.)

market forces . . . and not the . . . alleged misrepresentations, such an issue constitutes a question of fact better resolved at trial than on a motion to dismiss.")[3]

Defendants ask this Court to conduct a factual and expert analysis comparing the subject matter of the Hannon applications to Fire and other prior art references to determine whether Defendants' mishandling of the prosecution the Hannon applications was the cause of the harm CSHL alleges it suffered. But whether or not the Hannon inventions were disclosed by the prior art is a fact issue to be determined by the trier of fact with the assistance of expert testimony. The substantial evidence CSHL has submitted to the PTO regarding what the prior art discloses, including an expert declaration, is itself sufficient to preclude summary judgment on this issue. (*See, e.g.,* Bernstein Decl., Exs. A; B; and C). *See Davis v. McDowell*, 596 F.3d 1355 (Fed. Cir. 2010) (A party may establish causation in a patent malpractice action by introducing evidence sufficient to establish "the likelihood that [the invention] would have been held patentable on examination in the PTO . . . in accordance with the criteria of patentability applied during examination.") The issue raised by Defendants' motion is not appropriate on a motion under Rule 12(b)(6). The facts alleged in the Amended Complaint should be accepted as true despite whether Defendants believe them to be "doubtful in fact. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559, 555 (2007). Defendants' motion should, therefore, be denied.

---

[3] On this issue, New York and Massachusetts law are in harmony. As between the two, however, choice-of-law considerations favor New York law. *See St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch LLC*, 233 F. Supp. 2d 171 (D. Mass. 2002). In *St. Paul Fire and Marine*, as here, the law of the State in which the victim of malpractice resides controlled; not the State from which the advice was given. *Id.* at 178-79. Moreover, R&G has a New York office, from which R&G oversaw Vincent's practice.

### 2. Other Cited References Provide Further Evidence of Prejudice And Are Not Independent, Intervening Causes of CSHL's Failure to Obtain Patent Protection

Contrary to Defendants' argument, CSHL's malpractice claim does not turn on any one specific rejection based on any one specific reference before the U.S. Patent Office. While the complaint refers to specific rejections based on Fire, those merely "*illustrated*" the "prejudice to the Hannon Applications caused by Vincent's original attempt to describe the Hannon inventions by copying text from [the] Fire application." (Amended Complaint at ¶ 40 (emphasis added). *See also id.* at ¶ 46.) The consequence of Vincent's misconduct, however, went well beyond those specific rejections. Dr. Hannon's inventions "represented a considerable advance over the prior art" not just Fire. (*Id.* at ¶29.) "Rather than draft an original disclosure that unambiguously described the key features of Dr. Hannon's new shRNA technology," however, Vincent instead relied on copying large portions of text from the published Fire patent application, which described a different, older technology - distinct from the methods Dr. Hannon invented for using short RNA hairpins to stably regulate gene expression in mammalian cells. (*See id.* at ¶¶ 9, 27, 29, 43) Vincent knew or should have known that he could not properly draft a disclosure of the new technology Dr. Hannon invented, nor provide proper priority support for that invention, by copying text from the prior art. (*See id.* at ¶¶30-33). Nonetheless, Vincent relied on that copied text to do so.

Among other things, and unrelated to any PTO rejections based on Fire, Vincent's actions "deprived CSHL of the opportunity to obtain allowance of claims covering Dr. Hannon's inventions entitled to the [May 24, 2001 filing date of the '557 application], based on support from [that] application." (*See* Amended Complaint at ¶ 27) Moreover, as with Fire, Vincent's flawed drafting of the Hannon application has been similarly responsible for the continued

10

delays and difficulties CSHL has encountered in distinguishing Dr. Hannon's shRNA invention from other prior art that the Patent Office has cited against the claims. (*See, e.g., id.* at ¶ 85; Bernstein Decl., Ex. A.)  That such other prior art was not specifically referenced in the Complaint (and instead only referred to as "prior art") is, therefore, of no moment.

As CSHL has alleged, the prejudice that Vincent's negligence caused involves two issues that have repeatedly arisen as points of confusion with the Patent Office: 1) what a "short hairpin RNA" is in the context of Dr. Hannon's invention; and 2) how the short hairpin RNA methods invented by Dr. Hannon differ from methods described in the prior art using RNAs with different (non-short hairpin) structures. ( *See, e.g.*, Bernstein Decl., Ex. A at 14-15.)  Had Vincent properly drafted an original description of Dr. Hannon's invention instead of resorting to copying text from Fire, such confusion and the resulting delay in prosecution would have been avoided. Instead, to clarify these points, and distinguish the claimed short hairpin subject matter from the cited art, CSHL has had to supplement the prosecution record with additional evidence and expert testimony. (*See, e.g.,* Amended Complaint at ¶ 85; Bernstein Decl., Exs. A, B, and C.)

Ironically, defendants' argument points to this very confusion as demonstrating a lack of causation.  They devote extensive portions of their brief to argue that CSHL cannot demonstrate but-for causation arising from Vincent's negligence because other cited prior art allegedly described use of a "short hairpin."  But such a factual argument, which must await completion of discovery, including expert discovery, is improper here.  Nonetheless, that Defendants raise the issue of the meaning of short hairpin as a critical issue to patentability only confirms how Vincent's failure to properly draft an original disclosure, including proper detail defining a short hairpin RNA, has been a direct cause of CSHL's delay in obtaining a patent on Dr. Hannon's short hairpin technology.

### 3.  CSHL Can Demonstrate That But For Defendants' Conduct the PTO Would Have Allowed Claims To Issue Over Fire

Defendants argue that because CSHL cannot establish that Defendants conduct was the "but for" cause of its failure to obtain claims because the PTO has "repeatedly concluded that that Fire discloses the use of short-hairpin RNA to effect RNA interference in mammalian cells" (Defs. Memo. at 12.)  But in April 2011 the PTO acknowledged the shRNA methods of Dr. Hannon are different and patentable over Fire and withdrew all its remaining rejections based on that reference.  (Bernstein Decl., Ex. F, April 15, 2011 Office Action at 2-3.)[4]  Thus, whether the rejection over Fire occurred once or multiple times, with one examiner or multiple examiners, with Dr. Hannon's applications or the applications of others, this argument cannot defeat CSHL's malpractice claim.

### B.  CSHL Properly Alleges a Breach of Fiduciary Duty

Defendants' motion ignores that CSHL's breach of fiduciary duty claim relates not only to its conflicting representation and business interests, but also to R&G's refusal to assist CSHL in rectifying the harm Vincent caused in mishandling the prosecution of the Hannon applications and demand for a prospective waiver of liability.  The basis for that aspect of the claim is spelled out in detail in Plaintiff's Motion to Compel Production of Documents Concerning Internal Investigation (D.I.# 81), which this Court granted (D.I. 103.)  That aspect of the claim stands on its own.  Defendants' motion does not address this aspect of the claim.

---

[4] The 35 U.S.C. §102 (novelty) rejection of the pending '676 application claims based on Fire was withdrawn by the August 30, 2010 Office Action. The remaining rejection of the claims as obvious in view of Fire was withdrawn in the April 15, 2011 Office Action.

1.     **R&G's Representation of RXi Was in Direct Conflict with Its Representation of CSHL and Supports Its Breach of the Duty of Loyalty Claim**

Defendants contend that CSHL's Proposed Amended Complaint fails to allege that R&G's representation of RXi created a conflict of Interest. (Defs. Memo at 14-15.) They are wrong. As CSHL alleges, there was not only a conflict of interest, but R&G was aware of the conflict as soon as they began to represent RXi, and only after more than six months had passed finally sought a waiver from CSHL general counsel. (Amended Complaint at ¶71.) In fact, before R&G made any effort to seek such a waiver, CSHL and RXi had entered licensing negotiations and a resulting license agreement concerning Dr. Hannon's shRNA technology. Moreover, as CSHL alleges, when seeking the waiver R&G never informed CSHL that R&G had been acting as RXi's counsel since before the license agreement was entered, and that R&G intended to act not only as corporate counsel but also as patent counsel for RXi. As alleged, R&G not only failed to obtain a waiver, but also failed to request the waiver at an appropriate time and provide full disclosure in requesting the waiver. (*See* Massachusetts Rules of Professional Conduct, Rule 1.7; New York Lawyer's Code of Professional Responsibility, DR 5-101; EC 7-8.) These lapses were in breach of R&G's fiduciary duty of loyalty to CSHL. *See Anderson v. Nassau County Dep't. of Corr.*, 376 F. Supp. 2d 294, 299 (E.D.N.Y. 2005)("full disclosure and consent of the client *prior* to commencing adverse representation" is requisite and a waiver after commencing adverse representation cannot remove "resulting taint.")(emphasis in original)

Defendants contend that their ethical violations were excusable because Dr. Hannon may have been aware of the representation. (Defs. Memo. at 17, fn. 7.) But R&G did not represent Dr. Hannon individually; it represented the laboratory. Dr. Hannon, as an employee of the

Howard Hughes Medical Institute and a CSHL faculty member, had no authority to waive conflict of interest on behalf of CSHL. Thus, whether Dr. Hannon was or was not aware of R&G's representation of RXi – and R&G presents no proof that he was – R&G was under an obligation to obtain informed consent from appropriate authorities at CSHL to obtain a waiver of conflict. It failed to do so.

Attempting to excuse their ethical violations, Defendants argue they did not simultaneously represent RXi directly in the licensing negotiations. But in representing CSHL in connection with the Hannon patent applications, R&G, among other things, possessed privileged and confidential information about CSHL's patent licensing strategy. By putting itself in a position where it could reveal such information to RXi, R&G itself created a direct conflict of interest. In fact, had R&G simultaneously represented RXi in the licensing negotiations, CSHL would at least have been made aware of the conflict. It, however, never was.

### 2. R&G's Representation of Insert and Calando Was in Direct Conflict with Its Representation of CSHL and Supports Its Breach of the Duty of Loyalty Claim

R&G does not deny that Vincent approached Dr. Hannon to broker a business arrangement with Insert first and then Calando without disclosing to CSHL his business and professional involvement with those entities. (Amended Complaint at ¶ 63, 69.) Nor does R&G deny that "Vincent was aware of CSHL shRNA know-how and trade secret information and shared such information in connection with its relationship with Insert and Calando." (*Id.* at ¶ 70.) These form independent bases for CSHL's claim for breach of the duty of loyalty. R&G's motion should, therefore, be denied.

Defendants dispute the additional, independent allegation that Vincent "co-opted the inventions of CSHL" by including "CSHL-derived subject matter in the invention disclosure of

14

[Insert's and Calando's patent] application, including subject matter relating to a 'hairpin' RNA of '19-30 base pairs in length.'" Defendants argue that "because [the Insert application] does not seek patent protection for the alleged invention that CHSL claim as Dr. Hannon's" and, therefore, there was no conflict of interest. (Defs. Memo. at 15.) Again, to rule on its motion, Defendants ask this Court to conduct a factual and expert analysis by comparing the subject matter disclosed and claimed in the respective applications.[5] But whether or not the Hannon inventions were co-opted into the Insert and Calando patent applications is a fact issue that may depend on expert testimony. The issue is not appropriate on a motion under Rule 12(b)(6) as the facts alleged in the Amended Complaint should be accepted as true. *Twombly*, 550 U.S. at 570. Defendants' motion should therefore be denied.

### 3.   The Claim for Breach of Fiduciary Duty Properly Alleges Damages

Contrary to Defendants' arguments, CSHL has alleged actual damages based on R&G's and Vincent's breach of fiduciary obligations. CSHL alleges that "[h]ad Vincent and R&G satisfied their duties of care, Insert and Calando would have come to CSHL to obtain a license to the Hannon technologies." (Amended Complaint at ¶ 99.) These allegations recite actual damages. Defendants argue that the claim is deficient because CSHL failed to allege that Insert and Calando "infringed any of the claims of the Hannon Applications." Again, their argument merely attacks the substantive merits of the claim. Such merits can only be decided through discovery and trial.

In addition, CSHL further alleges that "[h]ad Vincent and R&G satisfied their duties of care to CSHL, CSHL would have prevented or, at a minimum, ameliorated, the harm caused by [Vincent's original negligent and fraudulent acts] and CSHL would have had information to

---

[5] Moreover, as the evidence will show, Defendants base their argument on a selective misreading of the Insert and Calando patent applications.

make an informed decision to seek substitute counsel." (Amended Complaint at ¶ 98.) For example, CSHL should be permitted to prove that had CSHL been informed of defendants' conflicting interests and misconduct with respect to Insert, Calando, and RXi, CSHL would have terminated its relationship with Vincent and sought substitute counsel. CSHL should be permitted to further prove that substitute counsel would at least have mitigated the harm caused by Vincent's inappropriate use of materials from the Fire applications, including for example by promptly disclosing the Fire application to the patent office, and avoiding Vincent's subsequent acts that compounded the initial harm, as alleged in paragraphs 35-42 of the Amended Complaint. These allegations also recite actual damages. At a minimum, these damages include the entirely avoidable attorney's fees paid to Vincent for his subsequent negligent prosecution of these applications, including fees paid for fraudulent patent searches from his IP Resource Co.

R&G's reliance on *Sentinel Prods. Corp. v. Platt*, 2002 WL 1613713 (D. Mass. July 22, 2002) is misplaced. *Sentinel* was decided on a motion for summary judgment. *Id.* at *1. R&G's motion would have the Court employ standards of summary judgment to assess the sufficiency of pleading on a motion to dismiss under Rule 12(b)(6), which is improper. In *Sentinel*, the Court found "there is no *evidence* offered that if Sentinel had had different representation, its patent applications would have fared any better." *Id.* at *11 (emphasis added). The Court did not rule that Sentinel failed to present a legally plausible claim. At this stage, CSHL has alleged that had it had different representation it would have fared better in prosecution. CSHL is entitled to prove that element.[6] That Sentinel failed to *prove* that element has no bearing on CSHL's ability to *plead* at this stage.

---

[6] In fact, the progress CSHL has made (even in view of the damage that Vincent's conduct already inflicted) in prosecuting the Hannon applications after obtaining new representation in itself would provide such proof.

16

C.   **CSHL's Fraud Claims Survive a Motion to Dismiss**

1.   **Failure to Disclose Copying**

CSHL's fraudulent concealment claim is premised not solely on malpractice and

Vincent's failure to disclose to Dr. Hannon, CSHL, and the PTO his negligence in copying the

Fire text as Defendants' allege.  The harm caused by Defendants' misconduct was not based an

isolated, single event.  Rather, by withholding material information concerning Vincent's

negligence, Defendants affirmatively perpetuated and compounded the harm of his misconduct

over a period of eight years – nearly half the life of a regular U.S. patent.  Had Vincent's copying

been revealed at an early stage of the prosecution, CSHL would have stemmed the harm it now

sustains by, among other things, firing Vincent and Ropes & Gray, retaining new counsel to

prosecute the applications, disclosing Vincent's misconduct to the PTO, and amending the

applications to properly reflect Dr. Hannon's invention without losing years of priority.  (D.I.#

107 at ¶¶ 11, 82.)  Even under Defendants' cited case law, these allegations are sufficient to

sustain a fraudulent concealment case.  *See Amadasu v. Ngati*, 2006 WL 842456 at *10

(E.D.N.Y. March 27, 2006) (plaintiff need only "allege that it failed to pursue an available

remedy which would have corrected or alleviated the condition caused by the malpractice had it

not be diverted from doing so by its reliance upon [the] defendant's alleged misrepresentation.")

(internal quotations omitted.)

In fact, CSHL alleges numerous acts of misrepresentation.  On multiple occasions,

Vincent improperly relied on copied text from Fire as support for claims directed to Dr.

Hannon's shRNA invention in correspondence and interviews with the PTO.  (*See e.g.*,

Amended Complaint at ¶¶ 41, 36.)  Dr. Hannon and lawyers from CSHL were privy to, and

relied on, these misrepresentations.  (*See e.g.*, *id.* at ¶¶ 36.)  These affirmative acts meet the FED.

R. CIV. P. 9(b) pleading standard.  See *Landmark Screens, LLC v. Morgan, Lewis & Bockius*, 2008 WL 4483817 (N.D. Cal. Oct. 2, 2008) (patent malpractice and fraudulent concealment case where allegations in which "two acts of affirmative misrepresentation" caused the failure of plaintiff to remedy harm caused by negligence before PTO meet "the *Rule 9(b)* pleading standard.")  Defendants' motions should, therefore, be denied.

### 2.    Invoices from Vincent's Company

Defendants do not deny any of the alleged facts giving rise to CSHL's claim of fraud against Vincent.  Apparently, it was because of these frauds against its clients and itself that R&G fired Vincent.  Yet R&G audaciously characterizes Vincent's victimization of many of R&G's clients as amounting to nothing more than "threadbare recitals."  That R&G seeks to dismiss a claim aimed solely against Vincent, in which R&G was also a victim, speaks not to the merits of CSHL's claim, but to R&G's attempt to keep further evidence that Vincent's conduct fell far below that of a reasonable attorney out of this case.  But it has no basis to do so.

R&G does not dispute that the fraud committed by Vincent damaged CSHL.  Rather, it points out that it has offered to settle the count by amount equal to the invoices paid by CSHL to Vincent's scam corporation and that its offer somehow defeats CSHL's cause of action.  An offer of settlement, here by another victim, does not eliminate a cause of action against the fraudulent perpetrator.

### D.    Negligence Against R&G

Defendants' motion for dismissal of CSHL's negligence claims is based on the same erroneous causation arguments with respect to CSHL's malpractice and breach of fiduciary duty claims.  For all of the reasons stated above with respect to those claims, Defendants' motion should be denied.

## IV.   CONCLUSION

For each of the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's First

Amended Complaint should be denied.


Dated: September 9, 2011

                                    By:     /s/ John O. Mirick
                                            John O. Mirick (BBO #349240)

                                            Mirick, O'Connell, DeMallie & Lougee, LLP
                                            100 Front Street
                                            Worcester, MA 01608-1477

                                            *Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I, John O. Mirick, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic (NEF) and paper copies will be sent to those indicated as non-registered participants on September 9, 2011.


                                            s/ John O. Mirick
                                            John O. Mirick