UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10128-RGS

COLD SPRING HARBOR LABORATORY

v.

ROPES & GRAY LLP and MATTHEW P. VINCENT

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

January 13, 2012

STEARNS, D.J.

In this legal malpractice action, plaintiff Cold Spring Harbor Laboratory (CSHL)

alleges that defendants Ropes & Gray LLP (R&G), and Matthew P. Vincent, a former

partner at R&G, mishandled the prosecution of a series of patent applications on behalf

of CSHL before the United States Patent and Trademark Office (PTO).  Presently

before the court are defendants' motions to dismiss.  The court heard oral argument on

January 10, 2012.

## BACKGROUND

CSHL is a leading biomedical research and educational institution, with a

principal place of business in Cold Spring Harbor, New York.  Am. Compl. ¶¶ 1, 13,

15.  Defendant R&G is a Delaware limited liability partnership with its principal place

of business in Boston, Massachusetts.  *Id*. ¶ 2.  Defendant Vincent was, until April of

2009, a registered patent attorney and a partner in R&G's Intellectual Property Group. *Id*. ¶ 3. Dr. Gregory Hannon is a Professor and Howard Hughes Medical Institute Investigator at CSHL. *Id*. ¶ 7. The Hannon laboratory at CSHL is involved in the study of a cellular mechanism called RNA interference (RNAi), and its application in the search for a cure for cancer.[1] *Id*. Starting in 1999, Hannon and his colleagues at CSHL (collectively, Hannon) developed methods and technologies to regulate gene expression by using synthetic RNA molecules called short hairpin RNAs (shRNAs). *Id*.[2]

From 2001 until late 2008, R&G acted as principal outside patent prosecution counsel for CSHL.[3] *Id*. ¶ 22. Vincent was the R&G attorney primarily involved in the

_____

[1] Generally, RNAi refers to the process by which double-stranded RNA regulates gene expression in the cell. *Id*. RNA has a robust impact on gene expression, making it a valuable tool in cancer research because synthetic RNA can be introduced into cells as a means of suppressing targeted genes.

[2] In 2002, Hannon's research on RNAi was recognized by *Science* magazine as the "Breakthrough of the Year." *Id*. ¶ 18.

[3] CSHL is the assignee of the entire right, title, and interest in the Hannon patent applications, which collectively refer to U.S. patent application numbers 09/858,862, filed May 16, 2001 (the '862 application); 09/866,557, filed March 24, 2001 (the '557 application); 10/055,797, filed January 22, 2002 (the '797 application); 10/350,798, filed January 24, 2003; 10/997,086, filed November 23, 2004; 11/791,554, filed May 23, 2007; 11/894,676, filed August 20, 2007; 12/152,655, filed May 15, 2008; 12/152,837, filed May 16, 2008; and international patent applications PCT/US01/08435, filed March 16, 2001 (the '435 PCT application); PCT/US03/01963, filed January 22, 2003; and PCT/US05/42488, filed November 23,

drafting and prosecution of all of the Hannon patent applications.  *Id*. ¶ 23.  CSHL

alleges that

> [w]hen Vincent drafted the three earliest non-provisional Hannon
> Applications (U.S. patent applications nos. 09/858,862, filed May
> 16, 2001, 09/866,557, filed March 24, 2001 and international
> patent application PCT/US01/08345, filed March 16, 2001), rather
> than providing an original, complete description of Dr. Hannon's
> work, Vincent instead relied upon copying extensive portions of
> text – essentially verbatim – from a prior patent application
> (WO/99/32619) published by a team led by another researcher in
> the [RNAi] field, Dr. Andrew Fire . . . to at least, in part, describe
> Dr. Hannon's inventions.

*Id*. ¶ 9.[4]  According to CSHL, "[a]bout one half of the 'Detailed Description of Certain

Preferred Embodiments' found in the three earliest filed Hannon Applications consists

of text copied from the Fire application."  *Id*.  On August 11, 2005, the PTO issued a

Notice of Allowance for the pending '557 (Hannon) application claims.  However, the

PTO subsequently withdrew the '557 application from issue, and on September 6,

2006, the PTO examiner rejected all pending claims as anticipated by the Fire Patent.

_____

2005, including all foreign patent applications filed therefrom.  Certain of the Hannon
applications claim a benefit of priority to U.S. provisional applications 60/189,739,
filed March 16, 2000 (the '739 application) and 60/243,097, filed October 24, 2000
(the '097 application).  *Id*. ¶ 19.

[4] Fire received U.S. Patent No. 6,506,559 for his RNAi technology, which issued
on January 14, 2003 (the Fire Patent).  The essentially identical disclosures of the Fire
application and the Fire Patent are referred to collectively hereinafter as the "Fire
Specification."  *Id*. ¶ 21.

*Id.* ¶ 39.

CSHL alleges that in follow-up communications with the PTO, "Vincent and R&G continued to rely on text copied from Fire despite the fact that this risked the false implication that Dr. Hannon's shRNA technology was either something that Fire invented or was suggested by the Fire application." *Id.* ¶ 37. According to CSHL, "neither R&G nor Vincent ever brought the fact of this copying of the Fire text, and the potential prejudice resulting from that copying, to the attention of Dr. Hannon and CSHL." *Id.* ¶ 11.

In early 2008, Dr. Vladimir Drozdoff, a Senior Licensing Associate and Patent Attorney for CSHL's Office of Technology Transfer, reviewed Vincent's prosecution of the Hannon patent applications. *Id.* ¶ 50. Through this investigation, CSHL became aware, for the first time, of the copying of a substantial amount of text from the Fire Specification. *Id.* ¶ 54. On April 1, 2008, Drozdoff and John Maroney, the Vice President, Legal Counsel, and Director of CSHL's Office of Technology Transfer, met with Vincent and R&G partner James Haley. *Id.* ¶¶ 41, 58. At the meeting, Vincent acknowledged that in filing the Hannon patent applications, he was aware that portions had been copied from the Fire Specification. *Id.* ¶ 58. CSHL requested R&G's cooperation in bringing the copying to the attention of the PTO. *Id.* ¶ 57. R&G refused to assist CSHL without first obtaining a signed waiver releasing R&G from any future

4

liability.  *Id*. ¶ 59.  CSHL refused to sign such a waiver.  Pl.'s Opp'n at 6.[5]

In late April of 2009, R&G fired Vincent.  Am. Compl. ¶ 4.  On July 20, 2009, Vincent resigned from the practice of law and surrendered his Massachusetts bar license.  *Id*.  Vincent's resignation was precipitated by "a disciplinary investigation revolving around his having, for more than six years, under cover of a separate company which he formed [the IP Resource Company], billed and collected from R&G's clients more than $700,000 for work that could not be substantiated or verified, purportedly without R&G's knowledge that he owned said company."  *Id*.  While serving as CSHL's counsel, R&G billed and collected approximately $10,000 from CSHL under the guise of work allegedly performed by the IP Resource Company.  *Id*. ¶ 77.

On February 16, 2010, CSHL filed a complaint against R&G and Vincent in the United States District Court for the Eastern District of New York.  On March 23, 2010, defendants filed motions to dismiss the Complaint pursuant to Rules 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure.  On January 22, 2011, the New York court granted defendants' motion to dismiss for improper venue and transferred the case to the District of Massachusetts.  On August 10, 2011, CSHL filed an Amended

---

[5] R&G contends that "it was completely proper for R&G to request a waiver of conflicts for the prospective representation in the face of CSHL's malpractice allegation."  Defs.' Reply at 6, citing Mass. Rules of Prof'l Conduct R. 1.7(b).

Complaint alleging claims of legal malpractice, breach of fiduciary duty, fraud and fraudulent concealment, and negligence against R&G and Vincent.  On August 24, 2011, defendants filed motions to dismiss the Amended Complaint pursuant to Rule 12(b)(6).

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . "  *Id.* at 555 (internal citations and quotations omitted).  "A suit will be dismissed if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011),

quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008).

## I.  Legal Malpractice Claim

"In a legal malpractice action a plaintiff who alleges his attorney was negligent in the prosecution of a claim will prevail if he proves that he probably would have obtained a better result had the attorney exercised adequate skill and care." *Poly v. Moylan*, 423 Mass. 141, 145 (1996).[6]  *See also Lyons v. Nutt*, 436 Mass. 244, 247 (2002) (a cause of action for attorney malpractice arises when the client realizes that he or she "'has sustained appreciable harm as a result of the lawyer's conduct'"). Violation of an attorney disciplinary rule may be considered as "some evidence" of negligence. *McCann v. Davis, Malm & D'Agostine*, 423 Mass. 558, 560 (1996).

_____

[6] The Amended Complaint does not specify the applicable law that controls CSHL's state law claims.  With regard to choice of law, Massachusetts has supplanted its traditional rule that looked to the substantive law of the state where the alleged wrong occurred with the "functional approach" of Restatement (Second) of Conflict of Laws § 142 (1971).  *Bushkin Assocs. v. Raytheon Co.*, 393 Mass. 622, 631-632 (1985).  *See also Nierman v. Hyatt Corp.*, 441 Mass. 693, 697-698 (2004); *Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co.*, 60 Mass. App. Ct. 493, 495 (2004) ("Massachusetts has adopted a functional choice-of-law approach.").  This functional approach "responds to the interests of the parties, the States involved, and the interstate system as a whole."  *Bushkin*, 393 Mass. at 631.  Here, while both Massachusetts and New York have an interest in the outcome of the case, Massachusetts has the greater interest, as the case involves alleged misconduct by a prominent Massachusetts-based law firm that occurred primarily in Massachusetts.  *See* Jan. 22, 2011 Mem. & Order at 28 (concluding that "it is in the interest of justice to transfer this case to the District of Massachusetts, where Vincent drafted the Hannon Applications and other PTO submissions that contained portions of the Fire text.").

CSHL alleges (in substantial detail) that R&G and Vincent committed legal malpractice by their collective failure to conduct the prosecution of Hannon's patent applications consistent with a reasonable standard of care, and that their misconduct delayed and prejudiced CSHL's efforts to perfect patents protecting Hannon's inventions. *Id*. ¶ 8. Defendants, for their part, argue that the Amended Complaint fails to state a claim for malpractice. They suggest that Vincent's conduct did not breach a duty of care because "CSHL does not contend that there is anything inherently wrong with copying text into a patent application. . . . To the contrary, such copying is accepted practice." Defs.' Mem. at 4 & n.3, citing David Pressman, Patent it Yourself 181 (13th ed. 2008). This citation to a popular how-to reference book, which states that copying is an accepted practice in patent drafting, is dubious at best, and at worst, an insult to the professional standards of the patent bar. CSHL contends (with justification) that "Vincent either knew or should have known" that copying large portions of text from the published Fire Specification would not accurately describe Hannon's inventions and distinguish them from the prior art. Am. Compl. ¶¶ 30-31.

Defendants also argue that CSHL's Amended Complaint fails to allege that Vincent's purported malpractice in copying from the Fire Specification "caused" the

PTO to reject the Hannon patent applications.[7]  This argument does not appear to be based on a fair reading of the Amended Complaint, which repeatedly alleges a causal link between Vincent's conduct and the PTO's rejection of the Hannon applications. *See, e.g.*, Am. Compl. ¶ 8 ("In its prosecution of patent applications intended to cover Dr. Hannon's shRNA inventions (the 'Hannon Applications'), R&G, and in particular, Vincent, the R&G attorney responsible for prosecution of these patents, committed malpractice through their failure to conduct the prosecution according to a reasonable standard of care, with the result that their conduct has both delayed and prejudiced CSHL's efforts to obtain patent claims covering Dr. Hannon's inventions in several ways . . ."); *id.* ¶ 42 (stating that a PTO Office Action noted that the disclosure in one of the Hannon patent applications was "essentially verbatim" of the disclosure in the Fire Specification, and that "it is unclear how applicant claimed invention differs from what has been disclosed by the prior art."); *id.* ¶ 48 ("[A]s a direct result of Vincent's and R&G's malpractice, the Hannon Applications have been unfairly prejudiced and

---

[7] Defendants assert that CSHL's claims have been repeatedly rejected by the PTO on the basis of prior art established by scientists other than Fire, and that the PTO consistently interpreted Fire as teaching shRNA in mammalian cells when rejecting claims sought by other scientists whose applications did not include text copied from the Fire Specification.  Defendants argue that these "facts" break the causal link between their alleged misconduct and CSHL's failure to obtain patent protection. *See* Defs.' Mem. at 10-12; Defs.' Reply at 3-5. Defendants are essentially asking the court to make a factual determination that Hannon's work was unpatentable, something which the court cannot do in deciding a motion to dismiss under Rule 12(b)(6).

compromised by the erroneous perception that the technology invented by Dr. Hannon is not sufficiently unique from what the Fire Specification describes to warrant a patent. Such a perception, created by Vincent's and R&G's misconduct, directly contributed to R&G's failure to obtain any allowed claims covering Dr. Hannon's invention.").

Defendants' factual arguments regarding the extent to which the alleged malpractice was the but-for cause of delays and denials by the PTO are improper on a Rule 12(b)(6) motion to dismiss.[8]  *See Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (stating that proximate cause "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."); *Curran v. City of Boston*, 777 F. Supp. 116, 123 (D. Mass. 1991) ("The question of proximate cause is a question of fact, and this court will not base a motion to dismiss upon such an issue.").  *See also Davis v. McDowell*, 596 F.3d 1355, 1364

---

[8] CSHL continues with new counsel (WilmerHale) to prosecute pending claims of certain of the Hannon patent applications before the PTO.  Through WilmerHale, CSHL has submitted substantial evidence to the PTO to demonstrate how Hannon's shRNA methods represented an advance over the prior art, including the Fire Patent. CSHL represents that as a result of these efforts, in April of 2011, the PTO acknowledged that Hannon's shRNA methods are different from and patentable over the Fire Patent and withdrew its remaining rejections based on that reference.  *See* Pl.'s Opp'n at 12.  The PTO has recently issued a Notice of Allowance of Hannon's claims directed to methods that allow stable suppression of gene expression in mammalian cells using shRNA.  In addition, CSHL has been granted patent claims in Europe directed to Hannon's shRNA invention.  *See id.* at 6-7.  These developments cast significant doubt on defendants' contention that the Hannon patent applications would have been rejected by the PTO "in any event."  Defs.' Mem. at 11.

(Fed. Cir. 2010) (stating that a plaintiff's "ultimate burden" in a patent malpractice action "is to establish the likelihood that her inventions would have been held patentable on examination in the PTO or any applicable national patent office, in accordance with the criteria of patentability applied during examination." Even "[a]t the summary judgment stage, she had only to introduce evidence sufficient to establish an issue of material fact as to patentability.").

## II.  Breach of Fiduciary Duty Claim

"A claim for breach of fiduciary duty has four elements: 1) existence of a fiduciary duty arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a causal relationship between the breach and the damages." *Qestec, Inc. v. Krummenacker*, 367 F. Supp. 2d 89, 97 (D. Mass. 2005), citing *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164 (1999). CSHL maintains that as its attorneys, R&G and Vincent owed it fiduciary duties of competence and loyalty. Am. Compl. ¶¶ 89-90. CSHL alleges that defendants breached these duties by simultaneously representing two of its competitors, Insert Therapeutics (including its successor Arrowhead Research Corporation and affiliate Calando) and RXi Pharmaceuticals Corporation (RXi). *Id.* ¶¶ 88-101, 113-120.

With regard to Insert, CSHL alleges that Vincent breached his duty of loyalty when he appropriated the Hannon inventions for the benefit of Insert by including

CSHL-derived subject matter in the invention disclosure of a patent application for Insert.  *Id.* ¶ 93.  Vincent later approached CSHL to propose a business venture between CSHL and Insert, without disclosing to CSHL his attorney-client relationship with Insert.  *Id.* ¶ 63.  Vincent and others subsequently formed Calando Pharmaceuticals, Inc. (Calando), to exclusively license Insert's technologies, including the shRNA technology allegedly developed by Hannon.  *Id.* ¶ 66.  Vincent then approached CSHL to propose a business venture between CSHL and Calando, without disclosing his relationship with Calando.  *Id.* ¶ 69.  CSHL alleges that R&G breached its fiduciary duty by permitting Vincent to represent Insert, as well as permitting Vincent to own Calando and participate in its business.  *Id.* ¶¶ 93, 95.[9]

CSHL further alleges that R&G and Vincent breached their duties of loyalty to CSHL by representing RXi Pharmaceuticals in patent prosecution and corporate matters, starting in February of 2007, without the informed consent of CSHL.  *Id.* ¶¶ 71, 96. In March of 2007, CSHL and RXi entered into a license agreement concerning Hannon's shRNA technology; however, R&G did not seek a waiver of conflict from

---

[9] CSHL, in addition to alleging negligence in R&G's oversight of Vincent, proposes to rely on the common-law principle (incorporated into the Uniform Partnership Act) that partners are subject to joint and several liability for torts committed by individual members of the partnership in the conduct of partnership business.  *See* Mass. Gen. Laws ch. 108A, §§ 13, 15; *Bachand v. Vidal*, 328 Mass. 97, 100 (1951).

CSHL until October of 2007.  *Id.* ¶¶ 71-72.  CSHL alleges that in seeking the waiver

of conflict, R&G never informed CSHL that it had been acting as RXi's counsel prior

to the formulation of the CSHL-RXi license agreement.  *Id.* ¶ 73.

Defendants contend that these allegations do not amount to a true breach of any

ethical duty owed to CSHL because

> CSHL *does not allege* that R&G simultaneously represented CSHL
> and/or RXi in connection with the parties' licensing agreement; that R&G
> ever represented RXi in prosecuting a patent application based on
> information obtained from CSHL or that otherwise conflicted with
> CSHL's interests; that R&G represented CSHL in an area where CSHL
> and RXi's interests conflicted; or that any problem of any type ever arose
> from the situation.

Defs.' Mem. at 14-15.  Defendants also dispute the allegation that Vincent "co-opted"

the inventions of CSHL for the benefit of Insert.  In short, defendants again attack the

substantive merits of CSHL's claims, which is premature in a Rule 12(b)(6) context.

For present purposes, CSHL's detailed allegations of multiple potential conflicts

of interest are sufficient to state a plausible claim for breach of fiduciary duty.  As

CSHL points out, in prosecuting the Hannon patent applications, Vincent and R&G

were necessarily made privy to confidential information about CSHL's patent licensing

strategy.  By putting themselves in a position where they could reveal such information

to potential competitors such as Insert and RXi, defendants created a direct conflict of

interest.  CSHL also plausibly alleges that R&G breached its fiduciary duties by failing

to request a conflict waiver at an appropriate time, and by failing to provide full disclosure in requesting the waiver. *See* Mass. Rules of Prof'l Conduct R. 1.7.

Defendants further argue that CSHL's breach of fiduciary duty claim should be dismissed because CSHL has failed to allege any damages stemming from the purported conflicts of interest.   Again, a fair reading of the Amended Complaint establishes the opposite. *See, e.g.*, Am. Compl. ¶ 98 ("Had Vincent and R&G satisfied their duties of care to CSHL, CSHL would have prevented or, at a minimum, ameliorated, the harm caused by the negligent and fraudulent acts as set forth in paragraphs 1-87 above and CSHL would have had information to make an informed decision to seek substitute counsel."); *id.* ¶ 101 ("Specifically, CSHL has been damaged in the form of: (i) additional attorneys' fees that it has been forced to expend as a result of R&G's and Vincent's wrongful acts and omissions, which is estimated to be no less than $500,000; (ii) lost licensing opportunities for the Hannon technology, which is estimated to be worth no less than $36,500,000 to $81,500,000; and (iii) disgorgement of all attorneys' fees paid by CSHL to R&G since 2001, which is estimated to be no less than $1,400,000.").[10]   Thus, defendants' arguments for

---

[10] In addition, CSHL appears to assert a "loss of chance" theory of damages, insofar as it alleges that the Hannon patent applications would have had a better chance of earlier approval before the PTO if Vincent had properly disclosed Hannon's invention rather than repeatedly relying on copied text. *See id.* ¶ 27 ("About one half of the 'Detailed Description of Certain Preferred Embodiments' (hereinafter, the

dismissing the breach of fiduciary duty claim at this time are unavailing.[11]

### III.  Fraud and Fraudulent Concealment Claim

"To establish a claim for fraud under Massachusetts law, a plaintiff must prove that 'the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'" *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 31 (1st Cir. 2009), quoting *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002).  CSHL alleges that by withholding material information concerning Vincent's negligence in prosecuting the Hannon patents over a period of eight years, defendants intentionally induced CSHL to continue employing defendants as patent counsel.  Am. Compl. ¶ 106.  CSHL claims

------

'Detailed Description') found in the three earliest filed non-provisional Hannon Applications consists of text copied from the Fire application. Vincent's failure to provide an adequate description of Dr. Hannon's technology in these applications seriously compromised the ability of these applications, in particular the '557 application, to serve as priority support for Dr. Hannon's patent claims. This fact has deprived CSHL of the opportunity to obtain allowance of claims covering Dr. Hannon's inventions entitled to the respective filing dates of these applications, based on the support from these applications.").  Massachusetts firmly embraces the loss of chance doctrine in a malpractice damages context.  *See, e.g.*, *Matsuyama v. Birnbaum*, 452 Mass. 1, 3, 10-11 (2008); *Renzi v. Paredes*, 452 Mass. 38, 39, 44-45 (2008).

[11] As acknowledged by counsel for CSHL at the hearing, with respect to R&G, CSHL may elect to focus solely on the malpractice claim at trial (waiving pursuit of the arguably duplicative breach of fiduciary duty and fraud claims).

that as a result of this fraudulent concealment and CSHL's reasonable reliance on Vincent's misrepresentations to the PTO (by way of the Hannon patent applications), "CSHL has been damaged in an amount to be determined at trial, including punitive damages." *Id.* ¶ 108.  CSHL contends that had Vincent's copying been revealed at an early stage of the prosecution, CSHL would have been able to mitigate the harm it has since suffered by moving earlier to retain new counsel to prosecute its patent applications, by disclosing Vincent's misconduct to the PTO, and by amending its patent applications to properly reflect Hannon's inventions without losing years of priority.  *Id.* ¶¶ 11, 82.

CSHL further alleges that Vincent committed a separate fraud in his tendering, through R&G, of invoices on behalf of the IP Resource Company totaling at least $9,587.45, which CSHL paid.  CSHL asserts that the statements of work performed on these invoices constituted material misrepresentations insofar as Vincent could not substantiate any work performed by the IP Resource Company for the benefit of CSHL.  *Id.* ¶¶ 110-111.[12]

Defendants argue that the Amended Complaint fails to allege the damages

---

[12] At the hearing, counsel for CSHL stated that he had not yet had an opportunity to review the R&G partnership agreement to determine whether R&G would be liable for Vincent's fraudulent billing through the IP Resource Company.  As a factual matter, it is not clear that the creation of the IP Resource Company by Vincent could be said to have furthered the conduct of the business of the R&G partnership.

element necessary to support a fraud claim.  With regard to the IP Resource Company invoices, R&G contends that CSHL cannot allege that it suffered actual damages because R&G has offered to reimburse CSHL for the IP Resource Company billings. Defendants assert that the fact that "CSHL has chosen not to cash the reimbursement check from R&G is a 'damage' of its own creation, which it has the power to remedy."  Defs.' Reply at 10.  However, R&G's offer to reimburse CSHL for its payments does not defeat CSHL's broader cause of action for fraud, particularly where CSHL alleges that R&G was complicit in concealing Vincent's copying.

## IV.  Negligence Claim

To prevail on a negligence claim, a plaintiff must prove that the defendant owed it a duty of reasonable care, that the defendant committed a breach of that duty, that damage resulted, and that there was a causal relation between the breach of duty and the damage.  *Leavitt v. Brockton Hosp., Inc.*, 454 Mass. 37, 39 (2009).

With respect to CSHL's negligence claim, defendants argue that "because CSHL has failed to plead that Mr. Vincent's alleged conduct caused CSHL any harm, there can be no liability against R&G."  Defs.' Mem. at 19.  However, as discussed previously, the Amended Complaint repeatedly pleads that Vincent's alleged misconduct caused CSHL significant harm.  *See, e.g.*, Am. Compl. ¶¶ 23, 27, 31, 33, 85-87, 101.  Thus, the court is unpersuaded by defendants' argument that CSHL's

negligence claim should be dismissed.

ORDER

For the foregoing reasons, defendants' motions to dismiss pursuant to Fed.

R. Civ. P. 12(b)(6) are <u>DENIED</u>.  The parties will file a joint proposed scheduling

order within fourteen days of the date of this opinion.

SO ORDERED.

/s/ Richard G. Stearns
_____

UNITED STATES DISTRICT JUDGE